**IT IS SO ORDERED.**


**SIGNED THIS: January 04, 2010**


_____
                        **THOMAS L. PERKINS**
            **UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____




### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STANDARD FORWARDING CO., INC., | ) | Case No. 09-83707 |
| | ) | |
| | ) | Honorable Thomas L. Perkins |
| Debtor. | ) | |
| | ) | |


**INTERIM ORDER ON MOTION OF DEBTOR PURSUANT TO SECTIONS 105(a), 362, 363, 364, 507 AND 552 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 4001(c) FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING POST-PETITION FINANCING; (B) AUTHORIZING THE USE OF CASH COLLATERAL; (C) GRANTING ADEQUATE PROTECTION; (D) MODIFYING THE AUTOMATIC STAY; AND (E) SCHEDULING A FINAL HEARING**

This matter coming on to be heard for preliminary hearing on the *Motion of the Debtor*

*Pursuant to Sections   105(a), 362, 363, 364, 507 and 552 of the Bankruptcy Code and*

*Bankruptcy Rule 4001(c) for Entry of Interim and Final Orders (a) Authorizing Postpetition Financing; (b) Authorizing the Use of Cash Collateral; (c) Granting Adequate Protection; (d) Modifying the Automatic Stay; and (e) Scheduling a Final Hearing* (the "Motion"), the Court having reviewed the Motion, the terms and provisions of this Interim Order, and having heard and considered statements of counsel, and any objections and any evidence offered; and the Court being fully advised in the premises;

### THE COURT FINDS AND CONCLUDES THAT:

A.     Standard Forwarding Co., Inc. (the "Debtor" or the "Borrower"), filed a petition for relief under Chapter 11 of Title 11 (the "Chapter 11 Case") of the United States Code (the "Bankruptcy Code") on November 13, 2009 (the "Petition Date").

B.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. sections 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. section 157(b)(2).  Venue is proper pursuant to 28 U.S.C. sections 1408 and 1409.

C.     The notice given of this preliminary hearing as set forth Paragraph L of this Interim Order constitutes sufficient "notice and hearing" under §§ 102, 363, and 364 of the United States Bankruptcy Code (the "Bankruptcy Code"), and Rules 2002, 4001, 6004, 6007, and 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and all applicable local rules.  **Except for the effect of section 364(e) of the Bankruptcy Code for loans and advances made prior to entry of the "Final Order" (as hereinafter defined), the relief provided herein is provisional in nature.**

D.     The Debtor is a party to the following documents with First Midwest Bank, N.A. (the "DIP Lender"), among other instruments and agreements:

2

i.      that certain Promissory Note dated May 11, 2008 in the principal amount of $5,000,000.00, as amended;

ii.     that certain Commercial Security Agreement dated May 9, 2008;

iii.    that certain Agreement to Pledge dated May 9, 2008;

iv.     that certain Mortgage dated October 26, 1998 (the "Mortgage");

v.      that certain Assignment of Rents dated October 26, 1998 ("Assignment of Rents");

vi.     that certain Promissory Note dated May 9, 2008 in the principal amount of $1,104,824.72;

vii.    that certain Promissory Note dated August 10, 2006, in the principal amount of $1,752,360.00;

viii.   that certain Promissory Note dated June 7, 2005, in the principal amount of $1,063,520.00;

ix.     that certain Promissory Note dated February 8, 2005, in the principal amount of $1,056,000.00;

x.      that certain Letter of Credit dated September 9, 1999 in the face amount of $1,300,000.00, as amended;

xi.     that certain Letter of Credit dated September 9, 1999 in the face amount of $693,452.00; and

xii.    that certain Business Loan Agreement dated May 30, 2006, as amended.

(the foregoing, together with all other prepetition agreements and instruments between DIP Lender and the Debtor are collectively referred to as the "Prepetition Loan Documents;" all amounts currently outstanding under the Prepetition Loan Documents shall collectively be referred to the "Prepetition Indebtedness").

E.      To secure the Prepetition Indebtedness, the Debtor granted to the DIP Lender under the Prepetition Loan Documents continuing liens and security interests in and to certain of its assets and properties, whether real or personal, tangible or intangible and wherever located, whether now or hereafter existing or acquired, and all the proceeds, products, offspring, rents and

3

profits thereof (the "Prepetition Collateral"). The Debtor and DIP Lender agree that the Prepetition Collateral excludes certain assets and properties listed in Exhibit A attached hereto (the "Excluded Assets"). The Debtor and DIP Lender expressly leave unresolved the issue of the status of Lender's interests in certain other assets of the Debtor, and whether such assets form part of the Prepetition Collateral. That issue will be resolved by a further order of the Court. The attachment of an exhibit containing a listing of excluded assets as Exhibit A to the Court's prior Interim Order does not constitute a binding stipulation or admission of the parties or a finding by the Court.

F.      The Debtor has agreed and admitted that the Prepetition Loan Documents and Prepetition Indebtedness are valid and enforceable and has waived, and is unaware of, any defenses, set-offs, or counterclaims to the claims of the DIP Lender with respect thereto.

G.      For purposes of this Interim Order, "Cash Collateral" shall mean "cash collateral" as defined in Section 363(a) of the Bankruptcy Code and shall include and consist of, without limitation, all of the respective property and assets of the Debtor that constitutes cash collateral in which the DIP Lender (whether in its prepetition or postpetition capacity) has an interest.

H.      The Debtor has demonstrated a need for immediate access to interim post-petition financing and use of Cash Collateral pursuant to section 364 of the Bankruptcy Code and Bankruptcy Rule 4001. In the absence of this immediate access, the Debtor will be unable to continue operating its business, causing immediate and irreparable loss or damage to the Debtor's estate, to the detriment of the Debtor, its estate, its creditors and other parties in interest. The Debtor does not have sufficient unrestricted cash and other financing available to operate its business, maintain the estate's properties, and administer the Chapter 11 Case absent the relief provided in this Interim Order.

4

I.      The terms of the use of the Cash Collateral pursuant to this Interim Order are fair

and reasonable, reflect the exercise of prudent business judgment by the Debtor consistent with

its fiduciary duties and are supported by reasonably equivalent value and fair consideration.

J.      The use of Cash Collateral alone would be insufficient to meet the Debtor's post-

petition operating needs.  Debtor represents that, despite good faith efforts, it is unable to obtain

(1) adequate unsecured credit allowable under §§ 503(b)(1) or 364(c)(1) of the Bankruptcy Code

as an ordinary administrative expense, (2) unsecured credit allowable under § 364(a) or (b) of the

Bankruptcy Code, (3) unsecured credit entitled to priority under § 364(c)(1) of the Bankruptcy

Code, or (4) adequate secured credit and §364(c)(2), (c)(3) or (d)(1) from any source other than

the DIP Lender that would be sufficient to enable Debtor to continue its business operations.

The only feasible source of secured credit available to the Debtor is the "DIP Credit Facility" (as

hereinafter defined).   The Debtor requires financing under the DIP Credit Facility under the

terms of this Interim Order in order to satisfy its immediate critical post-petition liquidity needs.

K.      The Debtor chose the DIP Lender as post-petition lender in good faith and after

obtaining the advice of experienced counsel and other professionals.  The Debtor and the DIP

Lender proposed and negotiated the terms of the DIP Credit Facility in good faith, at arm's

length, without collusion and with the intention that all obligations owed under the DIP Credit

Facility would be valid claims accorded the priority and secured by the liens set forth herein.

The loans and extensions of credit authorized in this Interim Order are supported by reasonably

equivalent value and fair consideration and the terms of the DIP Credit Facility are fair and

reasonable and reflect the Debtor's exercise of prudent business judgment consistent with its

fiduciary duties.  Any credit extended, loans made, or funds advanced to the Debtor pursuant to

this Interim Order or the DIP Credit Facility is deemed to be so extended, made or permitted to

84987 v3
CHIC_4606204.1

be used in good faith by the DIP Lender as required by and within the meaning of section 364(e) of the Bankruptcy Code. As a good faith lender, the DIP Lender's claims, super-priority status, security interests and liens and other protections arising from or granted pursuant to this Interim Order and the DIP Credit Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

L.    Due and proper notice of this Motion and the proposed form of this Interim Order has been provided to: (a) the Office of the United States Trustee for the Central District of Illinois; (b) counsel for the DIP Lender; (c) the twenty largest unsecured creditors of the Debtor; and (d) any potential holders of secured claims or liens against the property of the Debtor. Such notice was, in the Debtor's belief, and in the Court's judgment, is sufficient under the circumstances, and no other or further notice need be provided.

M.    It is in the best interests of the Debtor, its estate, and creditors that Debtor be immediately authorized to incur secured indebtedness and use Cash Collateral under this Interim Order and to execute, deliver, perform and consummate this Interim Order and all documents and instruments referred to herein or contemplated hereby.

N.    The DIP Lender has indicated a willingness to provide the Debtor with the DIP Credit Facility, but solely on terms and conditions set forth in this Interim Order and pursuant to the "DIP Loan Documents" as defined below. The DIP Lender is charging interest at the non-default rate on the Prepetition Indebtedness. After considering all of its alternatives, the Debtor has concluded, in an exercise of its sound business judgment, that the DIP Credit Facility is both necessary and warranted under the circumstances.

O.      The security interests and liens granted pursuant to this Interim Order to the DIP

Lender, are appropriate under section 364(d) of the Bankruptcy Code because, among other

things:  (i) such security interests and liens shall not impair the interests of any holder of a valid,

perfected, prepetition security interest or lien in the property of the Debtor's estate (the "Prior

Perfected Liens") and/or (ii) the holders of the Prior Perfected Liens have consented to the

security interests and priming liens granted pursuant to this Interim Order to the DIP Lender.

P.      The terms of the DIP Loan Documents are fair and reasonable under the

circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its

fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

**BASED ON THE FOREGOING FINDINGS, THE COURT HEREBY CONCLUDES AND ORDERS AS FOLLOWS:**

1.      The Motion is granted in its entirety.

2.      The Debtor is authorized to obtain financing from the DIP Lender on an interim

basis on the terms set forth below and as otherwise provided in this Interim Order;

3.      The terms of the DIP Credit Facility, as set forth below, are approved from the

date hereof through and including the "Final Hearing" (as hereinafter defined):

| | |
|---|---|
| **GUARANTORS:** | None. |
| **SENIOR DIP CREDIT FACILITY:** | Senior secured debtor-in-possession revolving credit facility in the maximum amount of **$1,000,000** (the "DIP Credit Facility"). |
| **CLOSE DATE:** | The date on which the initial funding of the DIP Credit Facility occurs (the "DIP Close Date"), which shall be no later than entry of the Interim Order. |
| **MATURITY:** | January 31, 2009. (the "DIP Credit Facility Maturity Date"). |
| **AVAILABILITY:** | Amounts under the DIP Credit Facility may be borrowed, repaid and |

7

reborrowed from the DIP Close Date until the DIP Credit Facility Maturity Date subject to the DIP Budget (as defined below).

**INTEREST RATES:**   The DIP Credit Facility, absent a default, will bear interest at Prime + 3.5%

**DEFAULT RATE:**   The rate otherwise in effect plus 3.0%.

**USE OF PROCEEDS:**   The proceeds of the DIP Credit Facility will be used exclusively for working capital and other specified uses of the Borrower in accordance with and as set forth in the budget attached hereto as <u>Exhibit B</u>, and made a part hereof (the "<u>DIP Budget</u>"). No other portion of the Chapter 11 Case administration expenses, priority claims or other bankruptcy related costs, fees or expenses of any nature or type incurred with respect to the Chapter 11 Case shall be funded with the proceeds of the DIP Credit Facility unless otherwise agreed to by the DIP Lender, except the "Carve-Out" (as hereinafter defined). **MAXIMUM LINE ITEM AND AGGREGATE VARIANCE FROM BUDGET, at 10% and 2%, respectively.** The line item for Professional Fees in the DIP Budget and the "Subsequent Approved Budgets" (as hereinafter defined) shall expressly exclude any Professional Fees to which Mesirow Financial, Inc. ("<u>Mesirow</u>") shall be entitled under the terms of its retention arrangement with the Debtor.

**APPLICATION OF PROCEEDS:**   Proceeds or payments received by the DIP Lender with respect to the "Collateral" (as hereinafter defined) shall be applied by the DIP Lender, in its sole discretion as follows: (a) to the payment of all reasonable costs, fees and expenses, including attorneys' fees of the DIP Lender in connection with both the DIP Credit Facility and the Prepetition Indebtedness; (b) with respect to the Prepetition Collateral, to the payment of Prepetition Indebtedness consisting of accrued and accruing interest; (c) with respect to the Prepetition Collateral, to the payment of Prepetition Indebtedness consisting of principal (d) to the payment of all accrued interest and reasonable costs, fees and expenses arising under the "DIP Loans" (as hereinafter defined); and (e) to the payment of the outstanding principal balance under the DIP Loans.

**FEES:**   *Commitment Fee*:  1% of the aggregate principal amount of the DIP Credit Facility, payable to the DIP Lender, upon approval of this Interim Order.

*Unused Line Fee*:  0.05% monthly, on the average daily unused portion of the DIP Credit Facility, payable monthly.

8

*L/C Fee*:   1% of the Face Amount of Letters of Credit issued hereunder, payable annually.

**SCHEDULED REPAYMENTS:**   The DIP Credit Facility will be due on the DIP Facility Maturity Date unless sooner terminated pursuant to the terms hereof.  Upon such termination, the DIP Loans will be payable on demand.

**MANDATORY PREPAYMENTS:**   The DIP Credit Facility or, at the option of the DIP Lender in its sole discretion, the Prepetition Indebtedness, will be reduced by proceeds of asset sales, sale-leasebacks, insurance proceeds and new debt or equity issuances in accordance with the Application of Proceeds Section of this Interim Order.

84987 v3
CHIC_4606204.1

**COLLATERAL:** The DIP Credit Facility will be secured (subject to the "Carve-Out" as hereinafter defined), pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code by a valid first priority perfected security interest in all assets of the Borrower (the "DIP Liens") and all proceeds and products of the foregoing including, but not limited to, all prepetition and post-petition real and personal property of the Borrower, whether now existing or hereafter acquired or arising, including, without limitation, all cash, including, without limitation, cash proceeds of the DIP Credit Facility, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, goods, fixtures, real property interests, lease interests, intellectual property, general intangibles, investment property, supporting obligations, letter of credit rights, commercial tort claims, and causes of action (the "DIP Collateral"). Notwithstanding the foregoing, the DIP Collateral and the DIP Liens shall expressly exclude preferences, fraudulent conveyances, and other avoidance power claims under Sections 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code (the "Avoidance Actions") or any recoveries therefrom (the Prepetition Collateral and the DIP Collateral shall sometimes be collectively referred to as the "Collateral").

10

**CONDITIONS PRECEDENT:**   **NONE**.

**DOCUMENTS:**   The DIP Credit Facility will be subject to the terms and conditions set forth in the Prepetition Loan Documents as modified herein (the "<u>DIP Loan Documents</u>").

**CASH MANAGEMENT: MAINTAIN EXISTING PROCEDURES**   Borrower shall maintain its existing cash management procedures.

**CARVE-OUT:**   The Interim Order and the "Final Order" (together the "<u>Financing Orders</u>") shall be subject to the payment of the following fees and claims (the "<u>Carve-Out</u>") following the occurrence of a "DIP Event of Default" (as hereinafter defined). The Carve-Out shall be in addition to any amounts set forth in the DIP Budget or in any subsequent budgets approved by the DIP Lender (the "<u>Subsequent Approved Budgets</u>"), and shall include the payment of all accrued and unpaid professional fees and expenses of attorneys, accountants, financial advisors and consultants retained by the Borrower, or any creditors' committee hereinafter appointed in the Chapter 11 Case "(the "Committee") (collectively "<u>Professionals</u>") and quarterly fees requested to be paid pursuant to 28 U.S.C. Section 1930(a) and fees payable to the Clerk of the Bankruptcy Court (the "<u>UST Fees</u>"). The Carve-Out shall not exceed the sum of $75,000 (excluding the fees and expenses earned by Mesirow), for the Professional of the Debtor and $25,000 for Professionals of the Committee, plus the UST Fees, less unapplied prepetition retainers. The fees and expenses earned by Mesirow and hereinafter allowed under section 328, 330 or 331 of the Bankruptcy Code shall be included in the Carve-Out without limitation.  Notwithstanding the foregoing, so long as there has not occurred  an uncured "DIP Event of Default" as provided in Paragraph 23 hereof, the Debtor shall be permitted to pay compensation and reimbursement of reasonable fees and expenses allowed and payable under section 328, 330 and 331 of the Bankruptcy Code, as the same may be due and payable, and such payments shall not reduce the unused portion of the Carve Out (provided that such fees and expenses are ultimately allowed on a final basis by this Court under Sections 330 and 331 of the Bankruptcy Code, and are included within the DIP Budget or Subsequent Approved Budgets, or in the case of Mesirow, are payable without further allowance under section 328 of the Bankruptcy Code). From and after the occurrence of an uncured DIP Event of Default, the Professionals shall be entitled to the payment of all reasonable

fees and expenses incurred up to the date of the uncured DIP Event of Default, provided that such fees and expenses are included in the DIP Budget and Subsequent Approved Budgets, with all such fees and expenses remaining subject to allowance pursuant to sections 330 and 331 of the Bankruptcy Code, or in the case of Mesirow subject to review under section 328 of the Bankruptcy Code, and such payments shall not reduce the amount of the Carve-Out.

4.      Subject to the rights of the Committee and all parties in interest with standing and requisite authority as provided herein, the Prepetition Loan Documents are valid and fully enforceable, and the liens and security interests under the Mortgage, the Assignment of Rents, or any security interests under, or related to, the Prepetition Loan Documents are proper and fully enforceable.

5.      The Prepetition Indebtedness is not contingent as to liability (except as to the "LC Obligations", as defined below) or the subject of a bona fide dispute, defense, counter-claim or right of setoff or recoupment as to liability or amount.

6.      As of the Petition Date the Prepetition Indebtedness was $6,523,188.00, plus interest, costs and fees (including, but not limited to, attorneys' fees and expenses), as they accrue.   The Prepetition Indebtedness also includes the contingent obligation under an outstanding letter of credit in the principal amount of $2,000,000 (the "LC Obligations").

7.      The terms of the DIP Credit Facility are hereby approved. The Debtor is hereby authorized to enter into the DIP Credit Facility and is authorized and directed to perform all obligations thereunder, including the payment of outstanding interest thereunder, and further including the payment of, fees, expenses, and other amounts due to the DIP Lender and its professional advisors and counsel pursuant to the DIP Credit Facility as the same become due. All reasonable out-of-pocket costs, fees and expenses of the DIP Lender payable in accordance

12

with the terms of the Prepetition Loan Documents and the DIP Loan Documents (including, without limitation, reasonable professionals' fees and expenses) (the "DIP Lender Expenses") shall be secured by the Collateral and afforded all of the priorities and protections afforded to the DIP Lender under this Interim Order and the DIP Loan Documents.  The Debtor shall pay invoices of the DIP Lender's professionals within ten (10) days of receipt, with any disputes with the Debtor regarding reasonableness to be resolved thereafter by the Bankruptcy Court. DIP Lender shall provide copies of all such invoices, with redactions, to the Committee.  All cash payments of interest and DIP Lender Expenses to the DIP Lender pursuant to this Interim Order shall be provisional in nature, subject to final allowance.

8.    Subject to the Carve-Out and the statutory fees of the United States Trustee, the DIP Credit Facility will (a) be secured by the DIP Collateral, (b) will constitute "Superpriority Claims" as hereinafter defined and (c) not be junior or subordinated to any other claim, or lien granted in this Chapter 11 Case under §§364 or 105 of the Bankruptcy Code or otherwise, other than the Prior Perfected Liens.

9.    The Debtor is hereby authorized to use Cash Collateral solely in accordance with the DIP Budget and all Subsequent Approved Budgets, and the other terms and conditions set forth in the DIP Loan Documents and the Financing Orders.

10.    The DIP Loan Documents shall constitute valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with the terms thereof.  No obligation, payment, transfer or grant of security under the DIP Loan Documents or this Interim Order, shall be stayed, restrained, voided, voidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

11.     All loans and letters of credit made to or for the benefit of the Debtor on or after the Petition Date under the DIP Loan Documents (collectively, the "DIP Loans"), all interest thereon, and all fees, costs, expenses, indemnification obligations and other liabilities owing by the Debtor to the DIP Lender under the DIP Loan Documents and this Interim Order shall hereinafter be referred to as the "DIP Obligations."  The DIP Loans:  (i) shall be evidenced by the books and records of the DIP Lender; (ii) shall bear interest payable at the rates set forth in the DIP Loan Documents; (iii) shall be secured in the manner specified herein and in the DIP Loan Documents; (iv) shall be payable in accordance with the terms of the DIP Loan Documents; and (v) shall otherwise be governed by the terms set forth herein and in the DIP Loan Documents.

12.     The DIP Budget reflects on a line-item basis the Debtor's anticipated cumulative cash receipts and expenditures on a weekly basis and all necessary and required cumulative expenses which the Debtor expects to incur during each week of the Budget.  The Debtor shall expend monies in compliance with the DIP Budget, and Subsequent Approved Budgets, subject to such modifications as may be agreed by the DIP Lender.  The Debtor shall provide to the DIP Lender, so as actually to be received within five (5) business days following the end of each week, weekly line-by-line variance reports for the preceding weekly period and on a cumulative basis from the Petition Date to the report date, comparing actual cash receipts and disbursements to amounts projected in the DIP Budget and Subsequent Approved Budgets, in form and scope reasonably acceptable to the DIP Lender.  Payment by the Debtor of expenses other than the itemized amounts set forth in the DIP Budget or Subsequent Approved Budgets shall constitute a DIP Event of Default unless the DIP Lender consents to such non-conforming payments in writing.

13.     Subject to the Carve-Out, and the Prior Perfected Liens, the DIP Liens and the "Adequate Protection Liens" as hereinafter defined shall constitute valid, enforceable and non-avoidable first priority security interests in and liens on all DIP Collateral.

14.     To the extent the DIP Liens include liens upon the Excluded Assets, such liens shall be enforceable only to the extent of the DIP Loans, and shall not secure any other liabilities or obligations of the Debtor to the DIP Lender, other than the "Adequate Protection Obligations" (as hereinafter defined) in the manner provided in Section 17 hereof.

15.     In addition to being secured by the DIP Liens, all DIP Obligations (including, without limitation, all DIP Loans) shall constitute allowed superpriority administrative expense claims (the "Superpriority Claims") with priority, subject to the Carve-Out, over any and all administrative expenses, diminution claims (including the Adequate Protection Obligations), and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, which Superpriority Claims shall, subject to the Carve-Out, be payable from and have recourse to all prepetition and post-petition property of the Debtor and all proceeds thereof. Notwithstanding the foregoing, the Superpriority Claims shall not be payable from the Avoidance Actions or any recoveries therefrom.

16.     [INTENTIONALLY OMITTED].

17.     As adequate protection for the use of the Prepetition Collateral and subject to the Carve-Out, the DIP Lender is hereby granted: (a) replacement liens and security interests and mortgages in the DIP Collateral to the same extent, validity and priority as the liens of the Bank on the Prepetition Collateral (the "Adequate Protection Lien"); and (b) a superpriority

15

administrative expense claim under §507(b) of the Bankruptcy Code (the "Adequate Protection

Priority Claim"). The Adequate Protection Lien and the Adequate Protection Priority Claim shall

secure any diminution in value of the Prepetition Collateral resulting: (a) from the use of the

Prepetition Collateral, including Cash Collateral by the Debtor; or (b) as a result of the

imposition of the automatic stay (the "Adequate Protection Obligations").  The Adequate

Protection Liens shall be junior in priority to the DIP Liens and senior to any and all other liens,

other then Prior Perfected Liens. The Adequate Protection Priority Claim shall be junior in

priority only to the Superpriority Claims. In no event shall the Adequate Protection Obligations

or the Adequate Protection Priority Claims be payable from Avoidance Actions or any recoveries

therefrom. Nothing herein shall preclude the DIP Lender from seeking additional adequate

protection of its interests in the Prepetition Collateral.  Furthermore, nothing herein shall be

construed as an acknowledgment or stipulation by the DIP Lender that its interests in the

Prepetition Collateral are adequately protected pursuant to this Interim Order or otherwise,

except for the DIP Credit Facility and the DIP Liens granted to the DIP Lender pursuant to this

Order, to the extent the liens of the DIP Lender are valid and perfected, the Debtor shall be

prohibited from incurring additional indebtedness with claim status with priority over the

Prepetition Indebtedness or liens equal to or senior in priority to the liens securing the Prepetition

Indebtedness without the prior written approval of the DIP Lender.  In no event shall the Debtor

seek relief based on the equitable doctrine of marshaling or any similar doctrine with respect to

the Prepetition Collateral or the DIP Collateral, or to an "equities of the case" claim under

section 552(c) of the Bankruptcy Code.

18.     Nothing herein shall constitute a consent by the DIP Lender, to any surcharge

claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses

incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral or the Prepetition Collateral. Except for the Carve-Out, no lien having a priority superior to or <u>pari passu</u> with those granted pursuant to this Interim Order to the DIP Lender shall be granted or allowed while any portion of the DIP Credit Facility (or any refinancing thereof), the DIP Obligations, or Adequate Protection Obligations remain outstanding. The Debtor shall not grant mortgages, security interests, or liens in the DIP Collateral to any parties pursuant to section 364(d) of the Bankruptcy Code or otherwise, without the express permission of the DIP Lender or, should the DIP Lender refuse, leave of Court after notice and hearing.

19.     The DIP Liens and the Adequate Protection Liens shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non-avoidable and effective by operation of law as of the date of entry of this Interim Order without any further action by any person, including the Debtor and the DIP Lender, without the necessity of execution by the Debtor, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with the U.S. Patent and Trademark Office, or other documents, provided however that the extent, validity and priority of the Adequate Protection Lien shall remain subject to paragraph 17 above. No liens or encumbrances shall be permitted on the DIP Collateral except as may be pre-existing on the Petition Date, granted pursuant to this Order, or hereafter approved in writing by the DIP Lender. If the DIP Lender hereafter requests that the Debtor execute and deliver financing statements, security agreements, collateral assignments, mortgages, or other instruments and documents considered by the DIP Lender to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens or the Adequate Protection Liens, the Debtor is hereby authorized and directed to execute and deliver

84987 v3
CHIC_4606204.1

such financing statements, security agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Lender is hereby authorized to file or record such documents in its discretion, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

20.    The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtor, and their respective successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed for or on behalf of any Debtor's estate or with respect to its property).

21.    The provisions of this Interim Order and any actions taken pursuant thereto (a) shall survive the entry of any order: (i) confirming any plan of reorganization; (ii) converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or (iii) dismissing the Chapter 11 Case, and (b) shall continue in full force and effect and notwithstanding the entry of any such order. The claims, liens, and security interests granted pursuant to this Interim Order shall maintain their priority as provided by this Interim Order until all of the DIP Obligations and the Adequate Protection Obligations, and the Prepetition Indebtedness, individually and collectively, are indefeasibly paid in full and discharged. This Court shall retain jurisdiction to enforce all provisions of this Interim Order notwithstanding the dismissal of the Chapter 11 Case for any reason. This Court's jurisdiction shall extend, among other things, to enforcement of the terms of this Interim Order and the DIP Loan Documents.

22.    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity of any the DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt by the DIP Lender of written notice of the effective date of such reversal,

18

modification, vacation or stay, or (ii) the validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligations or Adequate Protection Obligations. Notwithstanding any such reversal, modification, vacation or stay, any use of cash or the incurrence of DIP Obligations or Adequate Protection Obligations by the Debtor prior to the actual receipt by the DIP Lender of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Interim Order, and the DIP Lender shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Interim Order, and the DIP Loan Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations and Adequate Protection Obligations by the Debtor.

23.    The automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified in favor of the DIP Lender for the purposes herein set forth (the "DIP Stay Modification"), upon the occurrence and during the continuation of any newly arising Event of Default under the DIP Loan Documents or the Financing Orders other than: (i) Events of Default arising from the violation of affirmative and negative financial covenants, representations and warranties relating to insolvency or financial condition, insecurity and MAC clauses; and (ii) other Events of Defaults which existed on and continue after the Petition Date (the "DIP Event of Default") that are not cured under the applicable cure period in the DIP Loan Documents, and if there are no applicable cure periods, within three (3) business days after notice of such default from the DIP Lender. Upon the occurrence of the DIP Stay Modification, the Lender shall be entitled to exercise all rights and remedies provided for in the DIP Loan Documents and the Prepetition Loan Documents, and to take any or all of the following actions without further order

19

of or application to this Court: (a) immediately declare all DIP Obligations to be immediately due and payable and terminate the DIP Credit Facility; (b) immediately set off any and all amounts in accounts maintained by the Debtor with the DIP Lender against the DIP Obligations, or otherwise enforce rights against the Prepetition Collateral or the DIP Collateral in the possession of the DIP Lender; and (c) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents, the Prepetition Loan Documents, or applicable law to effect the repayment of the DIP Obligations and the Prepetition Indebtedness; provided, however, that the DIP Lender shall provide three (3) business days written notice (by facsimile, telecopy or otherwise) to counsel to the Debtor and counsel to the U.S. Trustee prior to first exercising any setoff or other enforcement rights or remedies with respect to the DIP Collateral or otherwise, for the purpose of enabling the Debtor or the Committee to seek a determination as to whether there has been a DIP Event of Default and failure to cure as aforesaid.  The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under the DIP Loan Documents or otherwise.

24.     If the Debtor files or cooperates with or supports a plan filed by any other entity that proposes any relief or provisions which are inconsistent with or limit the relief provided under or provisions of this Interim Order, such action shall constitute a default under the DIP Loan Agreement.

25.     The Debtor is hereby authorized, without further order of this Court to enter into agreements with the DIP Lender providing for any non-material modifications to the DIP Budget or the DIP Loan Documents, or of any other modifications to the DIP Loan Documents necessary to conform the DIP Loan Documents to this Interim Order.

20

26.     The stipulations and admissions contained in this Interim Order shall be binding on all parties in interest, unless, and solely to the extent that: (a) the Debtor, the Committee, or another party in interest with standing and requisite authority, has timely filed an adversary proceeding challenging the amount, validity, or enforceability of the Prepetition Obligations, or the perfection or priority of the DIP Lender's liens on and security interests in the Prepetition Collateral, in respect thereof, or otherwise asserting any claims or causes of action on behalf of the Debtor's estate against the DIP Lender, (i) forty-five (45) days after the date of the entry of this Interim Order or (ii) in the event a Committee is appointed, seventy-five (75) days after counsel for such Committee is retained by order of this Court, whichever is later (the "Challenge Deadline"), and (b) the Court rules in favor of the plaintiff in any such timely and properly filed adversary proceeding.  Should there be no adversary proceeding filed on or before the Challenge Deadline and/or should the Court issue a ruling(s) in favor of the DIP Lender, then, without further order of the Court, (i) the claims, liens and security interests of the DIP Lender shall, without further order of the Court, be deemed to be finally allowed for all purposes in the Chapter 11 Case and any subsequent chapter 7 cases and shall not be subject to challenge by any party in interest as to validity, priority or otherwise, (ii) the Debtor and its estate shall be deemed to have released any and all claims or causes of action against the DIP Lender with respect to the Prepetition Loan Documents or any related transactions and (iii) the recitals of this Interim Order shall be binding on all parties in interest, including, without limitation, the Committee. Notwithstanding anything to the contrary herein, if any such adversary proceeding is timely commenced, the provisions of this Interim Order and its waivers set forth herein shall nonetheless remain binding on the Debtor.

84987 v3

CHIC_4606204.1

27.     Notwithstanding anything to the contract contained herein, no person or entity shall be granted a lien on any claim or causes of action for avoidance arising under Chapter 5 of the Bankruptcy Code pursuant to the terms of this Order.

28.     This Interim Order shall be immediately effective upon its entry, and shall not be stayed until the expiration of 10 days or any other period after its entry pursuant to Bankruptcy Rule 6004(h) or otherwise.

29.     Any finding of fact set forth in this Interim Order that is a conclusion of law will be deemed to be a conclusion of law incorporated by reference in these conclusions of law as though fully set forth herein.

30.     The Motion is set for a final hearing (the "Final Hearing") to be held before this Court at 11:00 a.m. on January 20, 2010, with an objection deadline of 5:00 p.m. on January 18, 2010. At the final hearing, the Court shall consider the entry of the Final Order: (A) Authorizing Post-Petition Financing; (B) Authorizing the Use of Cash Collateral; and (C) Modifying the Automatic Stay (the "Final Order"). Any objection by creditors or any parties in interest to any provisions of this Interim Order and/or the Final Order shall be deemed waived unless such objection is timely and properly filed with this Court and served upon counsel to the Debtor and the DIP Lender at the addresses specified below. The Debtor shall serve a copy of this Interim Order and the proposed form of the Final Order (unless the Debtor and DIP Lender designate the Interim Order as the Final Order) by no later than January 13, 2010 to the following parties: (i) the United States Trustee in this District, (ii) each of the Debtor's twenty (20) largest unsecured creditors, (iii) the Debtor's secured creditors, (iv) counsel for the committee (if appointed), and (v) any other party entitled to or requested notice under Bankruptcy Rule 4001. The Debtor may provide such service by electronic mail, facsimile, U.S. mail and/or overnight courier. The

84987 v3
CHIC_4606204.1

hearing dates and deadlines in this paragraph are subject to change or extension by the Court in

its discretion and upon notice to the parties listed above.

31.    To the extent of any inconsistency between the terms of the Prepetition Loan

Documents, the DIP Financing Documents and this Interim Order, this Interim Order will control

in all respects.

Agreed as to Form and Content:

  /s/ Nathan Q. Rugg                                      /s/ Michael J, Small
Howard L. Adelman, Esq.                          Michael J. Small, Esq.
Henry B. Merens, Esq.                              Thomas C. Hardy, Esq.
Nathan Q. Rugg, Esq.                               Foley & Lardner LLP
Adelman & Gettleman, Ltd.                      321 N. Clark St., Suite 2800
53 W. Jackson Blvd, Suite 1050              Chicago, Illinois  60610
Chicago, Illinois  60604                           (t) 312-832-5832
(t) 312-435-1050                                       (f) 312-832-4700
(f) 312-435-1059

Counsel to the Debtor              Counsel to DIP Lender

###

84987 v3
CHIC_4606204.1

# EXHIBIT A

**STANDARD FORWARDING CO., INC.**

**INVENTORY LISTING - Tractors**

|  | UNIT | YEAR | MAKE | MODEL | MILEAGE | TITLE |
|---|---|---|---|---|---|---|
| 1 | 50 | 96 | OTTAWA | SPOTTER | 75,585 | STD FWD |
| 2 | 51 | 97 | CAPACITY | SPOTTER | 23,225 | STD FWD |
| 3 | 171 | 88 | MACK | SPOTTER | 1,764,101 | STD FWD |
| 4 | 172 | 88 | MACK | SPOTTER | 1,548,199 | STD FWD |
| 5 | 186 | 90 | MACK | CH613ST | 1,439,342 | STD FWD |
| 6 | 188 | 90 | MACK | CH613ST | 1,589,409 | STD FWD |
| 7 | 190 | 90 | MACK | CH613ST | 1,919,242 | STD FWD |
| 8 | 192 | 90 | MACK | CH613ST | 1,854,052 | STD FWD |
| 9 | 193 | 90 | MACK | CH613ST | 1,818,307 | STD FWD |
| 10 | 194 | 90 | MACK | CH613ST | 1,850,187 | STD FWD |
| 11 | 195 | 90 | MACK | CH613ST | 2,203,066 | STD FWD |
| 12 | 196 | 90 | MACK | CH613ST | 2,027,653 | STD FWD |
| 13 | 197 | 90 | MACK | CH613ST | 1,731,623 | STD FWD |
| 14 | 199 | 90 | MACK | CH613ST | 1,913,507 | STD FWD |
| 15 | 200 | 90 | MACK | CH613ST | 1,641,244 | STD FWD |
| 16 | 201 | 90 | MACK | CH613ST | 1,781,729 | STD FWD |
| 17 | 202 | 86 | OTTAWA | SPOTTER | 4,174 | STD FWD |
| 18 | 203 | 90 | MACK | CH613ST | 1,625,393 | STD FWD |
| 19 | 204 | 90 | MACK | CH613ST | 2,145,657 | STD FWD |
| 20 | 205 | 90 | MACK | CH613ST | 1,797,282 | STD FWD |
| 21 | 207 | 90 | MACK | CH613ST | 1,945,455 | STD FWD |
| 22 | 208 | 94 | MACK | CH613ST | 1,202,886 | STD FWD |
| 23 | 209 | 94 | MACK | CH613ST | 1,396,093 | STD FWD |
| 24 | 210 | 94 | MACK | CH613ST | 1,237,476 | STD FWD |
| 25 | 211 | 94 | MACK | CH613ST | 1,336,259 | STD FWD |
| 26 | 212 | 94 | MACK | CH613ST | 1,389,309 | STD FWD |
| 27 | 213 | 93 | MACK | CH613ST | 1,612,080 | STD FWD |
| 28 | 214 | 94 | MACK | CH613ST | 1,454,193 | STD FWD |
| 29 | 216 | 94 | MACK | CH613ST | 1,631,811 | STD FWD |
| 30 | 217 | 90 | CAP | SPOTTER | 2,562 | STD FWD |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 31 | 219 | 95 | MACK | CH613ST | 1,412,078 | | STD FWD |
| 32 | 220 | 95 | MACK | CH613ST | 1,242,404 | | STD FWD |
| 33 | 221 | 95 | MACK | CH613ST | 1,541,007 | | STD FWD |
| 34 | 222 | 95 | MACK | CH613ST | 1,199,929 | | STD FWD |
| 35 | 223 | 95 | MACK | CH613ST | 1,510,737 | | STD FWD |
| 36 | 224 | 95 | MACK | CH613ST | 1,240,779 | | STD FWD |
| 37 | 225 | 95 | MACK | CH613ST | 1,116,958 | | STD FWD |
| 38 | 226 | 95 | MACK | CH613ST | 1,234,191 | | STD FWD |
| 39 | 228 | 95 | MACK | CH613ST | 1,210,667 | | STD FWD |
| 40 | 229 | 96 | MACK | CH613ST | 1,254,522 | | STD FWD |
| 41 | 230 | 96 | MACK | CH613ST | 1,041,947 | | STD FWD |
| 42 | 231 | 96 | MACK | CH613ST | 1,405,992 | | STD FWD |
| 43 | 232 | 96 | MACK | CH613ST | 1,116,169 | | STD FWD |
| 44 | 233 | 96 | MACK | CH613ST | 1,374,771 | | STD FWD |
| 45 | 234 | 96 | MACK | CH613ST | 1,021,997 | | STD FWD |
| 46 | 235 | 96 | MACK | CH613ST | 1,359,960 | | STD FWD |
| 47 | 236 | 96 | MACK | CH613ST | 1,061,774 | | STD FWD |
| 48 | 237 | 96 | MACK | CH613ST | 1,153,818 | | STD FWD |
| 49 | 238 | 96 | MACK | CH613ST | 1,146,721 | | STD FWD |
| 50 | 239 | 96 | MACK | CH613ST | 1,082,962 | | STD FWD |
| 51 | 240 | 96 | MACK | CH613ST | 1,269,767 | | STD FWD |
| 52 | 241 | 96 | MACK | CH613ST | 954,354 | | STD FWD |
| 53 | 242 | 96 | MACK | CH613ST | 1,171,489 | | STD FWD |
| 54 | 243 | 97 | MACK | CH613ST | 1,079,377 | | STD FWD |
| 55 | 244 | 97 | MACK | CH613ST | 909,953 | | STD FWD |
| 56 | 245 | 97 | MACK | CH613ST | 1,241,387 | | STD FWD |
| 57 | 246 | 97 | MACK | CH613ST | 747,838 | | STD FWD |
| 58 | 247 | 97 | MACK | CH613ST | 1,109,989 | | STD FWD |
| 59 | 248 | 97 | MACK | CH613ST | 1,200,660 | | STD FWD |
| 60 | 249 | 97 | MACK | CH613ST | 1,089,103 | | STD FWD |
| 61 | 250 | 97 | MACK | CH613ST | 947,487 | | STD FWD |
| 62 | 251 | 97 | MACK | CH613ST | 964,126 | | STD FWD |
| 63 | 252 | 97 | MACK | CH613ST | 1,257,497 | | STD FWD |
| 64 | 253 | 97 | MACK | CH613ST | 1,127,557 | | STD FWD |
| 65 | 254 | 97 | MACK | CH613ST | 1,298,668 | | STD FWD |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 66 | 255 | 97 | MACK | CH613ST | 1,484,300 | | STD FWD |
| 67 | 256 | 97 | MACK | CH613ST | 1,221,032 | | STD FWD |
| 68 | 257 | 97 | MACK | CH613ST | 1,797,687 | | STD FWD |
| 69 | 263 | 97 | MACK | CH613ST | 1,182,496 | | STD FWD |
| 70 | 265 | 97 | MACK | CH613ST | 984,332 | | STD FWD |
| 71 | 290 | 90 | MACK | CH613ST | 940,438 | | STD FWD |
| 72 | 305 | 00 | CAPACITY | SPOTTER | 0 | | STD FWD |
| 83 | 316 | 93 | MACK | CH613ST | 783,244 | | STD FWD |
| 84 | 317 | 93 | MACK | CH613ST | 695,012 | | STD FWD |
| 85 | 318 | 93 | MACK | CH613ST | 722,108 | | STD FWD |
| 86 | 319 | 93 | MACK | CH613ST | 716,332 | | STD FWD |
| 87 | 320 | 93 | MACK | CH613ST | 683,693 | | STD FWD |
| 88 | 321 | 93 | MACK | CH613ST | 1,370,029 | | STD FWD |
| 89 | 322 | 93 | MACK | CH613ST | 1,441,179 | | STD FWD |
| 90 | 324 | 98 | MACK | CH613ST | 1,157,650 | | STD FWD |
| 91 | 325 | 98 | MACK | CH613ST | 979,105 | | STD FWD |
| 92 | 326 | 99 | MACK | CH613ST | 1,024,082 | | STD FWD |
| 93 | 327 | 99 | MACK | CH613ST | 1,350,797 | | STD FWD |
| 94 | 328 | 93 | MACK | CH613ST | 927,609 | | STD FWD |
| 95 | 329 | 93 | MACK | CH613ST | 1,031,455 | | STD FWD |
| 96 | 330 | 93 | MACK | CH613ST | 1,232,598 | | STD FWD |
| 97 | 331 | 93 | MACK | CH613ST | 1,112,922 | | STD FWD |
| 98 | 332 | 93 | MACK | CH613ST | 935,495 | | STD FWD |
| 99 | 334 | 99 | MACK | CH613ST | 850,599 | | STD FWD |
| 100 | 335 | 99 | MACK | CH613ST | 723,469 | | STD FWD |

| 101 | 336 | 99 | MACK | CH613ST | 828,759 | | STD FWD |
| 102 | 337 | 99 | MACK | CH613ST | 726,252 | | STD FWD |
| 103 | 338 | 99 | MACK | CH613ST | 1,147,087 | | STD FWD |
| 104 | 339 | 99 | MACK | CH613ST | 957,887 | | STD FWD |
| 105 | 340 | 99 | MACK | CH613ST | 996,655 | | STD FWD |
| 106 | 341 | 99 | MACK | CH613ST | 1,061,989 | | STD FWD |
| 107 | 342 | 99 | MACK | CH613ST | 938,989 | | STD FWD |
| 108 | 343 | 99 | MACK | CH613ST | 1,189,929 | | STD FWD |
| 109 | 345 | 99 | MACK | CH613ST | 1,046,453 | | STD FWD |
| 110 | 346 | 99 | MACK | CH613ST | 843,872 | | STD FWD |
| 111 | 347 | 99 | MACK | CH613ST | 915,195 | | STD FWD |
| 112 | 348 | 99 | MACK | CH613ST | 1,001,714 | | STD FWD |
| 113 | 349 | 99 | MACK | CH613ST | 786,988 | | STD FWD |
| 133 | 371 | 00 | MACK | CH613ST | 987,694 | | STD FWD |
| 134 | 372 | 00 | MACK | CH613ST | 1,035,815 | | STD FWD |
| 135 | 373 | 00 | MACK | CH613ST | 735,938 | | STD FWD |

| 136 | 374 | 00 | MACK | CH613ST | 878,377 | | STD FWD |
|-----|-----|----|------|---------|---------|---|---------|
| 137 | 375 | 00 | MACK | CH613ST | 674,138 | | STD FWD |
| 138 | 376 | 00 | MACK | CH613ST | 765,497 | | STD FWD |
| 139 | 377 | 00 | MACK | CH613ST | 738,801 | | STD FWD |
| 140 | 378 | 00 | MACK | CH613ST | 772,667 | | STD FWD |
| 141 | 379 | 00 | MACK | CH613ST | 690,046 | | STD FWD |
| 142 | 380 | 00 | MACK | CH613ST | 690,316 | | STD FWD |
| 143 | 381 | 00 | MACK | CH613ST | 757,549 | | STD FWD |
| 144 | 382 | 00 | MACK | CH613ST | 714,097 | | STD FWD |
| 145 | 383 | 00 | MACK | CH613ST | 832,279 | | STD FWD |
| 146 | 385 | 00 | MACK | CH613ST | 907,228 | | STD FWD |
| 147 | 386 | 00 | MACK | CH613ST | 678,669 | | STD FWD |
| 148 | 387 | 00 | MACK | CH613ST | 713,127 | | STD FWD |
| 149 | 388 | 00 | MACK | CH613ST | 792,374 | | STD FWD |
| 150 | 389 | 00 | MACK | CH613ST | 631,478 | | STD FWD |
| 151 | 390 | 00 | MACK | CH613ST | 800,087 | | STD FWD |
| 152 | 391 | 00 | MACK | CH613ST | 964,285 | | STD FWD |
| 153 | 392 | 03 | MACK | CH613ST | 707,885 | | STD FWD |
| 154 | 393 | 03 | MACK | CH613ST | 600,698 | | STD FWD |
| 155 | 394 | 00 | MACK | CH613ST | 711,908 | | STD FWD |
| 156 | 395 | 01 | MACK | CH613ST | 972,133 | | STD FWD |
| 157 | 396 | 01 | MACK | CH613ST | 1,011,248 | | STD FWD |
| 158 | 397 | 01 | MACK | CH613ST | 748,592 | | STD FWD |
| 159 | 398 | 01 | MACK | CH613ST | 860,707 | | STD FWD |
| 160 | 399 | 01 | MACK | CH613ST | 1,094,396 | | STD FWD |
| 161 | 400 | 98 | MACK | MS200 | 495,845 | | STD FWD |
| 162 | 401 | 01 | MACK | CH613ST | 1,080,337 | | STD FWD |
| 163 | 402 | 01 | MACK | CH613ST | 959,302 | | STD FWD |
| 164 | 403 | 98 | MACK | CH613 | 625,373 | | STD FWD |
| 165 | 404 | 98 | MACK | CH613 | 706,073 | | STD FWD |
| 166 | 415 | 01 | MACK | CH613 | 445,894 | | STD FWD |
| 167 | 416 | 01 | MACK | CH613 | 591,303 | | STD FWD |
| 168 | 417 | 01 | MACK | CH613 | 845,843 | | STD FWD |
| 169 | 418 | 01 | MACK | CH613 | 743,596 | | STD FWD |
| 170 | 419 | 01 | MACK | CH613 | 1,064,395 | | STD FWD |

| 171 | 420 | 01 | MACK | CH613 | 829,839 | | STD FWD |
| 172 | 421 | 01 | MACK | CH613 | 886,071 | | STD FWD |
| 173 | 422 | 01 | MACK | CH613 | 311,631 | | STD FWD |

| 211 | 460 | 03 | CAPACITY | SPOTTER | 9,738 | | STD FWD |
|-----|-----|-----|----------|---------|-------|---|---------|
| 212 | 461 | 01 | MACK | CH613 | 804,664 | | STD FWD |
| 213 | 462 | 01 | MACK | CH613 | 557,641 | | STD FWD |
| 214 | 463 | 01 | MACK | CH613 | 649,031 | | STD FWD |
| 215 | 464 | 01 | MACK | CH613 | 612,790 | | STD FWD |
| 216 | 465 | 01 | MACK | CH613 | 527,555 | | STD FWD |
| 217 | 466 | 01 | MACK | CH613 | 546,968 | | STD FWD |
| 218 | 467 | 01 | MACK | CH613 | 526,994 | | STD FWD |
| 219 | 468 | 01 | MACK | CH613 | 694,465 | | STD FWD |
| 220 | 469 | 01 | MACK | CH613 | 475,721 | | STD FWD |
| 221 | 470 | 01 | MACK | CH613 | 613,098 | | STD FWD |
| 222 | 471 | 02 | CAPACITY | SPOTTER | 20,465 | | STD FWD |
| 232 | 481 | 07 | MACK | CXP613 | 364,155 | | STD FWD |



| 252 | 501 | 06 | FORD | F750 | 14,804 | | STD FWD |
| 253 | 502 | 07 | FORD | F750 | 37,833 | | STD FWD |
| 254 | 503 | 07 | FORD | F750 | 20,926 | | STD FWD |
| 255 | 504 | 07 | FORD | F750 | 19,023 | | STD FWD |
| 256 | 505 | 04 | OTTAWA | SPOTTER | 0 | | STD FWD |



**STANDARD FORWARDING CO., INC.**
**INVENTORY LISTING - Trailers**

| QUANTITY | YEAR | MAKE | MODEL | SIZE | TITLE |
|---:|---|---|---|---|---|
| 9 | 1972 | FRUEHAUF | DROP DECK | 42 | STD FWD |
| 1 | 1972 | FRUEHAUF | VAN | 45 | STD FWD |
| 1 | 1973 | FRUEHAUF | VAN | 40 | STD FWD |
| 1 | 1974 | FRUEHAUF | VAN | 40 | STD FWD |
| 2 | 1976 | FRUEHAUF | VAN | 45 | STD FWD |
| 1 | 1977 | FRUEHAUF | VAN | 45 | STD FWD |
| 1 | 1978 | FRUEHAUF | VAN | 45 | STD FWD |
| 1 | 1979 | FRUEHAUF | VAN | 45 | STD FWD |
| 10 | 1980 | GREAT DANE | DROP DECK | 42 | STD FWD |
| 7 | 1981 | AZTEC | DROP DECK | 42 | STD FWD |
| 3 | 1981 | FRUEHAUF | VAN | 45 | STD FWD |
| 2 | 1982 | TRANSCRAFT | GRAIN | 40 | STD FWD |
| 1 | 1984 | FRUEHAUF | FLATBEDS | 40 | STD FWD |
| 2 | 1984 | UTILITY | TAUGHTLINER | 48 | STD FWD |
| 1 | 1985 | UTILITY | TAUGHTLINER | 48 | STD FWD |
| 4 | 1986 | UTILITY | TAUGHTLINER | 48 | STD FWD |
| 1 | 1986 | GREAT DANE | TAUGHTLINER | 48 | STD FWD |
| 1 | 1987 | TRAILMOBILE | TAUGHTLINER | 48 | STD FWD |
| 2 | 1988 | FRUEHAUF | VAN | 53 | STD FWD |
| 5 | 1989 | FRUEHAUF | VAN | 53 | STD FWD |
| 26 | 1990 | FRUEHAUF | VAN | 48 | STD FWD |
| 1 | 1990 | GREAT DANE | TAUGHTLINER | 48 | STD FWD |
| 1 | 1991 | GREAT DANE | TAUGHTLINER | 48 | STD FWD |
| 1 | 1991 | GREAT DANE | VAN | 42 | STD FWD |
| 1 | 1991 | UTILITY | TAUGHTLINER | 48 | STD FWD |
| 1 | 1991 | TRAILMOBILE | FLATBEDS | 45 | STD FWD |
| 20 | 1994 | WABASH | VAN | 53 | STD FWD |
| 1 | 1995 | FRUEHAUF | VAN | 53 | STD FWD |
| 1 | 1996 | FRUEHAUF | VAN | 53 | STD FWD |
| 49 | 1996 | WABASH | VAN | 53 | STD FWD |
| 148 | 1997 | FRUEHAUF | VAN | 53 | STD FWD |
| 99 | 1998 | FRUEHAUF | VAN | 53 | STD FWD |
| 2 | 2000 | GREAT DANE | VAN | 28 | STD FWD |
| 2 | 2000 | GREAT DANE | VAN | 32 | STD FWD |
| 4 | 2000 | GREAT DANE | VAN | 48 | STD FWD |
| 4 | 2003 | GREAT DANE | VAN/ROLLDR | 48 | STD FWD |
| 4 | 2004 | GREAT DANE | VAN/ROLLDR | 53 | STD FWD |
| 10 | 2005 | STRICK | VAN/ROLLDR | 53 | STD FWD |

**Standard Forwarding Co., Inc.**
**Business Auto Listing**

## Administration

| Year | Make | Model | Vin # | License Plate # | Title # | Asset # | Service | Price | Dec-08 | Date in | Purchase TITLE | Mileage |
|------|------|-------|-------|-----------------|---------|---------|---------|-------|--------|---------|----------------|---------|
| 2005 | Buick | Lacrosse | 2G4WD582751320282 | IL 902 0283 | X5207690420 | 9220 | Jul-05 | $ 23,571 | 113,098 | | STD FWD | |
| 2007 | Buick | Lacrosse | 2G4WC582971174339 | IL G52 5106 | X7156084037 | 13150 | May-07 | $ 22,748 | 29,457 | | STD FWD | |
| 2007 | Chevy | Impala | 2G1WB58K679146967 | IL G79 5757 | X6268045026 | 12020 | Aug-06 | $ 20,204 | 90,412 | | STD FWD | |
| 2003 | Dodge | Dakota | 1D7HG48N83S115031 | IL 12 111 C | T3241154031 | 4580 | Aug-03 | $ 25,840 | 147,791 | | STD FWD | |
| 2004 | Chrysler | Concorde | 2C3HD56G34H695475 | IL B54 3953 | T3343227032 | 4840 | Nov-03 | $ 22,237 | 126,271 | | STD FWD | |
| 2007 | Chevy | Impala | 2G1WB58K579157118 | IL G79 5758 | X6268045025 | 12010 | Aug-06 | $ 20,310 | 54,651 | | STD FWD | |
| 2008 | Toyota | 4 Runner | JTEBU17R280129842 | IL X66 1961 | X8010644190 | 14250 | Dec-07 | $ 36,938 | 22,616 | | STD FWD | |

## Sales Reps

| Year | Make | Model | Vin # | License Plate # | Title # | Asset # | Date in Service | Purchase Price | Mileage Dec-08 | | |
|------|------|-------|-------|-----------------|---------|---------|-----------------|----------------|----------------|---|---|
| 2008 | Chevy | Impala | 2G1WT58NX89107095 | IL H31 2539 | X9113691603 | 14800 | Apr-09 | $ 13,057 | 35,592 | | |
| 2008 | Chevy | Impala | 2G1WB58K181285890 | IL A34 0334 | X8130692215 | 14550 | Apr-08 | $ 19,778 | 16,370 | STD FWD | |
| 2008 | Chevy | Impala | 2G1WB58K589259830 | IL A60 6608 | X8148080002 | 14580 | Apr-08 | $ 19,333 | 18,508 | STD FWD | |
| 2008 | Chevy | Impala | 2G1WT58K469348900 | IL 490 9893 | X6156068005 | 10840 | May-06 | $ 22,013 | 106,457 | STD FWD | |
| 2007 | Chevy | Impala | 2G1WB58K979212383 | IL G48 8734 | X7079649444 | 12650 | Feb-07 | $ 20,911 | 77,515 | | |
| 2005 | Chevy | Equinox | 2CNDL23F556045045 | IL 792 2397 | X5031047033 | 7190 | Jan-05 | $ 23,454 | 150,001 | STD FWD | |
| 2007 | Chevy | Impala | 2G1WB58K879227274 | IL G52 5106 | X7156084035 | 13140 | May-07 | $ 20,797 | 50,336 | STD FWD | |
| 2005 | Chevy | Impala | 2G1WF52E359333944 | IL 838 0408 | X5216008026 | 8920 | Jun-05 | $ 19,868 | 110,389 | STD FWD | |
| 2005 | Buick | Lacrosse | 2G4WD532051312125 | IL 905 8560 | X6107691368 | 10580 | Apr-06 | $ 24,663 | 82,296 | STD FWD | |
| 2007 | Chevy | Impala | 2G1WT58K879410302 | IL 923 7752 | X7323691536 | 14070 | Oct-07 | $ 20,835 | 35,031 | STD FWD | |
| 2008 | Chevy | Impala | 2G1WT58K989280046 | IL A34 0316 | X8123691079 | 14540 | Apr-08 | $ 21,261 | 25,691 | STD FWD | |
| 2006 | Ford | 500 | 1FAFP25126G137806 | IL 899 6792 | X8178023014 | 10850 | May-06 | $ 22,417 | 117,391 | STD FWD | |
| 2006 | Chevy | Impala | 2G1WB58K069353529 | IL 905 8578 | X8178692183 | 11030 | Jun-06 | $ 20,318 | 58,372 | STD FWD | |
| 2007 | Ford | 500 | 1FAFP24157G122266 | IL G97 0021 | X7087691010 | 12660 | Feb-07 | $ 23,200 | 70,500 | STD FWD | |
| 2006 | Chevy | Impala | 2G1WB58K069189537 | IL 905 8542 | X6052690432 | 10370 | Feb-06 | $ 20,032 | 44,754 | STD FWD | |
| 2007 | Chevy | Impala | 2G1WB58K179135343 | IL G79 5756 | X6268045027 | 12030 | Aug-06 | $ 20,204 | 113,831 | STD FWD | |
| 2007 | Chevy | Impala | 2G1WB58K679174350 | IL 923 7739 | X7263691200 | 13860 | Aug-07 | $ 20,879 | 41,575 | STD FWD | |
| 2005 | Ford | 500 | 1FAFP251X5G196004 | IL 838 7423 | X5235165019 | 9240 | Jul-05 | $ 23,012 | 131,787 | STD FWD | |
| 2007 | Chevy | Impala | 2G1WB58K679235678 | IL 923 7741 | X7263692096 | 14050 | Sep-07 | $ 20,779 | 27,968 | STD FWD | |
| 2005 | Chevy | Impala | 2G1WF52E659385987 | IL 993 3837 | X5279007005 | 9300 | Aug-05 | $ 20,701 | 89,006 | STD FWD | |

## Company Vehicles

| Driver | Year | Make | Model | Vin # | License Plate # | Title # | Asset # | Date in Service | Purchase Price | Mileage Jan-09 | |
|--------|------|------|-------|-------|-----------------|---------|---------|-----------------|----------------|----------------|---|
| Company | 2005 | Chrysler | Town & Country | 4GP44R15R319 | IL 908 0608 | X6128690450 | 10590 | Apr-06 | $19,355 | 46,648 | STD FWD |
| Company - CRA | 2003 | Dodge | Intrepid | 3HD46RX3H524 | IL 510 7332 | T3036771009 | 2860 | Jan-03 | $21,601 | 194,515 | STD FWD |
| Shop | 2004 | Chevy | Impala | 1WF52E449169. | IL 773 1942 | X4295095022 | 6820 | Sep-04 | $18,550 | 113,710 | STD FWD |
| Shop | 1998 | Chevy | P-U Trk | CEK19MXT1231' | IL 1471 DM | T4051084017 | 4960 | Jan-04 | $11,573 | 172,447 | STD FWD |

**Standard Forwarding Co., Inc.**
**Real Estate Property Values - 11 Aug 2009**

| Location | Zip Code | Address | Occupancy | % Occupied | Year Purchased | Acreage | Dock (sq ft) | Office (sq ft) | Shop (sq ft) | Total (sq ft) | Title |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Owatonna, MN | 55060 | 555 Havelka Place | Terminal | 100% | 2007 | 1.30 | 2,160 | 420 | 0 | 2,580 | STD FWD - No Mtge |
| Crawfordsville, IN | 47933 | 5601 State Road 32 Eas | Terminal | 100% | 2005 | 5.61 | 4,470 | 1,430 | 0 | 5,900 | STD FWD - No Mtge |

Note: Owatonna, MN terminal purchased in 2007 for $100,000
Note: Crawfordsville, IN terminal purchased in 2005 for $180,000

# EXHIBIT B

# Standard Forwarding Co., Inc.

**Cash Budget Forecast - January, 2010**

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 3 | | | | | | Jan-10 | |
| 4 | *Work Days* | | | | | 20 | |
| 5 | *Holidays* | | | | | 1 | |
| 6 | *Total Days* | | | | | 21 | |
| 7 | | | | | | | |
| 9 | | | | | | | |
| 10 | **Projected Cash Receipts** | | | | | $  4,000,000 | |
| 11 | | | | | | | |
| 12 | | | | | | | |
| 13 | | Fixed | Fixed | | | | |
| 14 | **OPERATING EXPENSES:** | Per Day | Per Month | Variable | | | |
| 15 | Driver Wages | | | 27.75% | | $  1,076,147 | |
| 16 | Dock Wages | | | 3.25% | | $  125,495 | |
| 17 | Manager/Supv/Dispatch Salaries & Wages | $  7,519 | | | | $  157,894 | |
| 18 | Dock Manager/Supv Salaries & Wages | $  834 | | | | $  17,510 | |
| 19 | Customer Service Salaries & Wages | $  1,318 | | | | $  27,675 | |
| 20 | Operations Non Bargaining Benefits | $  2,421 | | | | $  50,844 | |
| 21 | Billing/Clerks Wages | $  1,610 | | | | $  34,495 | |
| 22 | Shop Management Wages | $  636 | | | | $  13,360 | |
| 23 | Shop Management Benefits | $  157 | | | | $  3,302 | |
| 24 | Shop Maintenance Wages | $  2,485 | | | | $  53,236 | |
| 25 | Parts & Outside Repairs | $ 12,382 | | | | $  260,014 | |
| 26 | Shop Operating Expenses | $  487 | | | | $  10,225 | |
| 27 | Tractor Lease/Rental Expense | $  142 | | | | $  2,991 | |
| 28 | Trailer Lease/Rental Expense | $  27 | | | | $  573 | |
| 29 | Forklift/Misc Ops Equip Lease/Rental | $  45 | | | | $  954 | |
| 30 | Fuel/Oil/Taxes | | | 14.57% | | $  607,579 | |
| 31 | Forklift Fuel Expense | | | 0.45% | | $  15,637 | |
| 32 | Insurance - Fleet/Cargo Coverages | | $  15,860 | | | $  35,860 | |
| 33 | License/FHUT Expense | | $  583 | | | $  583 | |
| 34 | Cartage Agent and Interline Expense | | | 3.59% | | $  125,174 | |
| 35 | Terminal Rents | | $  88,743 | | | $  88,743 | |
| 36 | Communications - Cellular/Radio | | | 0.76% | | $  26,478 | |
| 37 | Other Operating Expenses | $  2,884 | | | | $  90,558 | |
| 38 | | | | | | | |
| 39 | **GENERAL & ADMIN EXPENSES:** | | | | | | |
| 40 | Information Systems Salaries & Wages | $  581 | | | | $  12,205 | |
| 41 | Finance/Accounting Salaries & Wages | $  1,722 | | | | $  36,164 | |
| 42 | Marketing/Sales Salaries & Wages | $  6,585 | | | | $  138,275 | |
| 43 | Exec/Admin Support Salaries & Wages | $  1,565 | | | | $  32,869 | |
| 44 | G&A Benefits | $  2,374 | | | | $  49,846 | |
| 45 | Other General/Admin Expenses | $  3,728 | | | | $  103,282 | |
| 46 | Real Estate Taxes | | | | | $  - | |
| 47 | Insurance | | $  7,542 | | | $  32,542 | |
| 48 | Communications | $  654 | | | | $  13,727 | |
| 49 | Utilities | $  634 | | | | $  39,951 | |
| 50 | Professional Fees | | | | | $  300,000 | |
| 51 | Closing Costs - APA | | | | | $  15,000 | |
| 52 | Quarterly Fee - US Trustee | | | | | $  13,000 | |
| 53 | Potential Cure Amounts from Purchased Contracts | | | | | $  18,285 | |
| 54 | | | | | | | |
| 55 | **UNION BENEFITS** | | | | | | |
| 56 | Union Benefits (excl Health & Pension) | | | 9.05% | | $  270,302 | |
| 57 | Union Pension | | | 10.04% | | $  434,776 | |
| 58 | Union Health | | | 9.28% | | $  378,547 | |
| 59 | | | | | | | |
| 60 | **Projected Cash Expenditures** | | | | | $  4,714,096 | |
| 61 | | | | | | | |
| 62 | **Projected Operating Cash Surplus (Shortage)** | | | | | $  (714,096) | |
| 63 | | | | | | | |
| 64 | | | | | | | |
| 65 | Interest Income | | | | | $  1,087 | |
| 66 | Interest Expense - Revenue Equipment | | | | | $  (13,372) | |
| 67 | Interest Expense - Building | | | | | $  (4,957) | |
| 68 | Interest Expense - Line of Credit | | | | | $  (8,000) | |
| 69 | Other Misc Income(Expense) | | | | | $  3,829 | |
| 70 | Total Other Inc (Exp)-Net | | | | | $  (21,413) | |
| 71 | | | | | | | |
| 72 | **Projected Net Overall Cash Surplus (Shortage)** | | | | | $  (735,510) | |