## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| STANDARD FORWARDING | ) | Case No. 09-83707 |
| CO., INC., an Illinois corporation, | ) | |
| | ) | Honorable Thomas L. Perkins |
| Debtor. | ) | |

**MOTION OF THE DEBTOR FOR THE ENTRY OF AN ORDER: (A) APPROVING AN ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE ESTATE; (B) AUTHORIZING THE SALE OF THE ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) AUTHORIZING IMMEDIATE PAYMENT OF PRIORITY CLAIMS UPON CLOSING OF SALE**

TO:    THE HONORABLE THOMAS L. PERKINS,
        UNITED STATES BANKRUPTCY JUDGE:

NOW COMES, Standard Forwarding Co., Inc., an Illinois corporation, debtor and debtor-in-possession herein ("**Standard**" or the "**Debtor**"), by and through its undersigned counsel, and hereby requests the entry of order: (A) approving the asset purchase agreement by and between the Debtor and Standard Forwarding LLC, a Delaware limited liability company ("**Standard Acquisition**" or "**Purchaser**") for the sale of substantially all of the assets of the estate; (B) authorizing the sale of the assets of the Debtor pursuant thereto free and clear of liens, claims, encumbrances and interests; (C) authorizing the assumption and assignment of executory contracts and unexpired leases; and (D) authorizing the payment of priority claims immediately upon closing of the proposed sale, pursuant to Sections 363 and 365 of the Bankruptcy Code (the "**Code**") and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Motion**"). In support of the Motion, the Debtor respectfully states as follows:

## I.     INTRODUCTION

After extensive marketing of the Business and months of lengthy negotiations with all key constituencies in this case, the Debtor hereby submits for approval a sale that is in the best interest of all creditors and parties in interest. As a result of critical compromises with the Pension Funds and unions, and continuous negotiations since December, 2009, the attached sale agreement is the central component of a process to sell substantially all of the assets of debtor's estate and provide substantial, meaningful distributions to all unsubordinated, allowed claims of the estate. In summary, the debtor submits that this process, if approved by this Court, will:

(a)      Generate a means to continue the business operations of the Debtor under new ownership and new collective bargaining agreements that will preserve over 450 union and non-union jobs and ensure new and future contributions into pension, health and welfare funds;

(b)      Provide for the assumption by Purchaser of (i) Debtor's secured debt in full; (ii) all claims related to the Debtor's large-deductible insurance policy in full; (iii) all known priority employee claims in full; and all postpetition administrative costs that remain unpaid through the closing of the Sale continuing until the dismissal of the Chapter 11 Case;

(c)      Provide for payment of all non-assumed priority claims (*i.e.* claims for any unpaid taxes and contributions to Pension Funds) as soon as possible after the Closing;

(d)      Provide distributions of no less than 85% (and up to 100%) of all unsubordinated, general unsecured debt not otherwise assumed; and

(e)      Confirm the agreed subordination of approximately $68,000,000 of general unsecured debt attributable to withdrawal liability to the Pension Funds.

## II.    BACKGROUND

### A.    The Chapter 11 Case

1.    On November 13, 2009 (the "**Petition Date**"), the Debtor filed a voluntary petition under Chapter 11 of the Code in this District, and from and after said date has continued to operate its properties and manage its affairs as a debtor-in-possession under the supervision of this Court pursuant to Sections 1107 and 1108 of the Code (the "**Chapter 11 Case**").

2.    The United States Trustee appointed a committee of unsecured creditors in the Chapter 11 Case (the "**Committee**").

3.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue lies properly in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).

4.    The statutory predicates for the relief requested herein are Sections 363 and 365 of the Code and Rules 2002, 6004, 6006, 6007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

### B.    Background of the Business

5.    Founded in 1934, Standard began as a one-truck, one-trailer operation. Standard has grown significantly since its founding and now has approximately 460 employees and a diversified customer base. The Debtor's fleet consists of over 280 tractors and 655 trailers, providing "less-than-truckload" transportation services primarily to Illinois, Indiana, Iowa, Minnesota and Wisconsin, but also extending to Canada via partnerships with Canadian carriers. The Debtor has contracts with over 90 shippers. Standard also generates fuel surcharge revenue (collectively, the business and operations of the Debtor shall be hereinafter referred to as the "**Business**").

85931v.3 2/12/2010

6.     The Debtor owns its main terminal, located in East Moline, Illinois, that serves as a central hub for the Debtor's transportation services. The Debtor operates 14 additional terminals throughout the Midwest, twelve of which are leased.

7.     The Debtor is signatory to the National Master Freight Agreement, the Central Region Over-the-Road and Local Cartage Supplemental Agreements, the Standard Forwarding Co., Inc. Supplement dated January 26, 2009, the Mechanics' Maintenance Supplemental Contract Addendum dated March 12, 2009, the Office Clerical Employees Contract Addendum (covering East Moline Clerical employees) dated February 9, 2009, the Addendum applicable to the Dubuque, Iowa Office Contract dated March 12, 2009, and the Addendum applicable to the Waterloo, Iowa Office Contract dated February 9, 2009 (collectively referred to as the "**Collective Bargaining Agreements**").

8.     Pursuant to the Collective Bargaining Agreements (and predecessor agreements), the Debtor (a) has contributed to the Central States Southeast and Southwest Areas Pension Fund ("**Central States Fund**") and the International Brotherhood of Teamsters Union Local No. 710 Pension Fund (the "**Local 710 Fund**", and together with the Central States Fund, the "**Pension Funds**"), and (b) contributes to certain health and welfare funds for its union employees (collectively, the "**Health and Welfare Funds**").

**C.     Financing Prior to the Chapter 11 Case**

9.     The Debtor's primary secured lender, First Midwest Bank, N.A. ("**First Midwest**") issued various term notes (the "**Term Notes**") over the last ten (10) years to finance the purchase of tractors and trailers used in the Business and its main terminal in East Moline. Standard also utilizes a $5 million line of credit with First Midwest pursuant to that certain Business Loan Agreement dated May 30, 2006, as amended (the "**Financing Agreement**") (collectively, with the Term Notes and all other prepetition agreements and instruments between

4

First Midwest and the Debtor, the "**Prepetition Loan Documents**"). As of the Petition Date, Standard is liable to First Midwest under the Prepetition Loan Documents in the total approximate amount of $6,523,188 (collectively, the "**Prepetition Indebtedness**"). Further, as part of the Financing Agreement, First Midwest has issued a letter of credit in the amount of $1.9 million to EMC Insurance Companies in connection with the large-deductible insurance policies maintained by the Debtor in connection with worker's compensation and liability claims.

10.    Standard understands and believes the Prepetition Indebtedness is secured by liens and security interests in and to a substantial portion of its assets and properties, pursuant to, among other things, various UCC-1 financing statements and mortgages filed or recorded in various jurisdictions. In addition to its encumbered assets, Standard does currently have assets, primarily tractors, trailers and real estate, which are not subject to any perfected liens or encumbrances.

### D.    Current DIP Financing and Use of Cash Collateral

11.    On November 19, 2009, the Court entered that certain *Interim Order on Motion of Debtor Pursuant to Sections 105(a), 362, 363, 364, 507 and 552 of the Bankruptcy Code and Bankruptcy Rule 4001(c) for Entry of Interim and Final Orders (A) Authorizing Post-petition Financing; (B) Authorizing the Use of Cash Collateral; (C) Granting Adequate Protection; (D) Modifying The Automatic Stay; and (E) Scheduling a Final Hearing* [Docket No. 32](the "**Interim Order**").

12.    Thereafter, pursuant to the Interim Order and further orders entered on January 4, 2010 and January 28, 2010 [Docket Nos. 156 and 174] (collectively, the "**Interim Order(s)**"), the Debtor has used cash collateral in accordance with the "DIP Budgets" made a part of the Interim Orders. The current "DIP Credit Facility Maturity Date" is February 28, 2010.

5

### E.  Chapter 11 Objectives – The Bidding Procedures Motion

13.     After analyzing the ramifications of filing for protection under Chapter 11 of the Code, and the potential alternatives thereto, the Debtor believed the Chapter 11 Case afforded it the best means of preserving its enterprise value while finding a purchaser that may continue its business and thereby preserve nearly 500 jobs.  At the same time, the Chapter 11 Case stands to protect the claims and interests of the Debtor's customers, creditors, employees and other parties in interest.

14.     The Debtor determined that its ability to obtain the necessary long term funding needed to support an internal plan of reorganization would not likely be forthcoming given the status of its Business prior to the Petition Date. The Debtor believed that to undertake such effort will seriously impair the value of the assets in its estate and delay and diminish any ultimate distribution to the creditors herein. As a result, the Debtor entertained offers to acquire substantially all of Debtor's assets as a going concern on an expedited basis.

15.     To that end, prior to and after the Petition Date, the Debtor negotiated an asset purchase agreement for the sale of substantially all of its assets and filed a motion [Docket No. 60] on November 25, 2009, seeking approval of, among other things, a sale process, bidding procedures, and an asset purchase agreement (the "**Bidding Procedures Motion**").  The Bidding Procedures Motion further sought the approval of a certain stalking horse bidder (the "**Proposed Stalking Horse**") based on the terms of the asset purchase agreement. Various parties, including the Committee and the Pension Funds, filed preliminary objections to the Bidding Procedures Motion.

16.     In response to these objections and in recognition of the significance of the relief sought in the Bidding Procedures Motion, counsel for and representatives of the Debtor met with the Committee, representatives of the Pensions Funds and the unions, and their respective

85931v.3 2/12/2010

counsel on December 8, 2009. As result of the discussions and negotiations that took place at the meeting, the Debtor presented to the Court on December 9, 2009 (the "**December 9 Hearing**"), the Bidding Procedures Motion together with a universal compromise among the objecting parties, the Debtor and the Proposed Stalking Horse.

17.     After the December 9 Hearing, and pursuant to the Court's instruction, the Debtor circulated a proposed bidding procedure order among the objecting parties and the Proposed Stalking Horse. The Debtor, Committee and First Midwest eventually reached an agreed form of the bidding procedures order (the "**Proposed Order**"), but the Proposed Stalking Horse raised additional issues with respect to the bidding procedures order. Primarily, the Proposed Stalking Horse was unwilling to provide an earnest money deposit pursuant to the deadlines originally set in the asset purchase agreement without first securing a new collective bargaining agreement with the unions.

18.     On December 21, 2009, the Debtor sent a correspondence to the Proposed Stalking Horse thereby seeking confirmation whether it would proceed under the asset purchase agreement as modified by the Proposed Order. In a correspondence dated December 22, 2009, the Proposed Stalking Horse terminated the operative asset purchase agreement.

**F.     New Asset Purchase Agreement with Core Management Group**

19.     At the time it filed the Bidding Procedures Motion, the Debtor understood and believed that any significant delay in embarking upon a sale process would have a material adverse effect on the value of the assets being offered for sale, given the ongoing administrative costs of the Chapter 11 Case, a decline in sales volumes, its above-market labor costs and the resulting limitations on the cash flow needed to continue operations.

20.     The financial and business pressures facing the Debtor did not appreciably subside after the Petition Date; the same issues raised in its "first day" motions remain today.

7

Accordingly, after the Proposed Stalking Horse terminated the purchase agreement, the Debtor required immediate action to maintain the going concern value of its assets and its Business.

21.     As further detailed below, Mesirow Financial, Inc., the court-appointed financial advisor and investment banker for the Debtor, generated significant interest from two potential buyers after the Petition Date. The Debtor did not, however, receive any written offers for the Business. Further, it became clear from the responses received from potential buyers, as well as the issues raised by the Potential Stalking Horse, that third parties were not prepared to commit time and resources to seriously pursue an offer for the Business without a prior, concrete resolution of existing labor and pension issues.

22.     Thereafter, four members of the Debtor's core management team formed a corporate entity (Standard Acquisition) as part of an effort to generate a sale that would maintain the business operations of the Debtor and preserve all of the jobs, union and non-union, of its employees. Management has significant experience in the trucking industry and with Standard, which is exemplified best by its ability to negotiate new collective bargaining agreements acceptable to the union employees and deemed feasible by Standard Acquisition for a successful business moving forward.

23.     John Ward, the President and a director of Standard, has been associated with Standard for over twenty-five years and has been integrally involved with Standard's prior and current day-to-day operations and business affairs. The remaining three members of the management team, Brian Bassier (Controller), Tim Conrad (Vice President of Sales and Marketing), and Terry Olsen (Vice President of Operations), have an average of over 20 years of experience in the industry.

85931v.3 2/12/2010

## G. The Assets Offered for Sale

24. The property of the Debtor's estate which is being offered for sale hereunder includes substantially all of the assets which are used in the operation of the Business, and are considered part of and necessary for the continued conduct of the Business (collectively, the **"Transferred Assets"**) are fully set forth in Section 2.1 of the "Management Offer" (as hereinafter defined), and are summarized below:

  a.   cash and accounts receivable;

  b.   inventory;

  c.   deposits (including customer deposits and security deposits for rent, electricity, telephone or otherwise) and prepaid charges and expenses of the Debtor;

  d.   all of the Debtor's real property, consisting of terminals located in East Moline, Illinois, Owatonna, Minnesota, and Crawfordsville, Indiana, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

  e.   furniture and equipment;

  f.   all "Transportation Equipment", including tractors, trailers, and material handling equipment owned by Standard;

  g.   Debtor's right, title and interest in intellectual property, if any, to the extent assignable in accordance with applicable bankruptcy law;

  h.   specific executory contracts and unexpired leases, including those related to the Debtor's terminals, to the extent assignable in accordance with applicable bankruptcy law;

  i.   all documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business;

  j.   all permits used by Standard, to the extent assignable in accordance with applicable law;

  k.   all supplies owned by Standard;

  l.   unexpired rights of Standard under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to services provided;

  m.   the name "Standard Forwarding Co., Inc.", and the domain name standardforwarding.com, the Standard Carrier Alpha Code (SCAC) "STDF" and all telephone numbers, email addresses and facsimile numbers used by Standard;

9

n.     all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Purchased Assets or Purchased Intellectual Property owned by Standard;

o.     the $400,000 certificate of deposit pledged to secure the letter of credit relating to the workers' compensation and automobile liability insurance arrangements of Standard;

p.     $20,000 certificate of deposit pledged to the Illinois State Fire Marshall in connection with underground storage tanks at the Standard's East Moline facility; and

q.     With the exception of the "Excluded Assets" (as hereinafter defined) all other assets, properties, claims, rights and interests of Standard which relate to the Business, of every kind and nature and description.

25.     The listings of the Transferred Assets are voluminous and are detailed in Bankruptcy Schedules filed by the Debtor with the Clerk of this Court on December 8, 2009 [Docket Nos. 94-107] , and are also detailed in the Management Offer.  Significantly, as discussed below, the offer also includes the assumption of significant amount of the Debtor's existing liabilities, including its secured obligations.

## H.     Prepetition Secured Indebtedness and Priority Claims

26.     As of the Petition Date the Debtor was indebted to the following secured lenders and equipment lessors:

a.     First Midwest under the Prepetition Loan Documents in the total approximate amount of the Prepetition Indebtedness, plus up to $1.9 million in contingent liabilities arising from the Debtor's worker's compensation and liability insurance through the issuance by First Midwest of a letter of credit in the amount of $1.9 million to EMC Insurance Companies in connection therewith.

b.     Daily revolving amounts owed to Wells Fargo Bank, N.A. in connection the Debtor's credit card program, which are secured by a cash collateral account at Wells Fargo in the amount of $100,000.

c.     IOS Capital in connection with certain equipment leases.

d.     IKON Financial Services in connection with certain equipment leases.

(collectively, the "**Secured Creditors**").  The Management Offer includes the assumption of First Midwest secured debt, as well as the existing contracts relating to all Secured Creditors.

10

27.     In addition, as of the filing of the Chapter 11 Case, the Debtor scheduled priority claims in the amount of $1,883,562.41, comprised of employee vacation and benefit obligations, contributions to the Pension Funds outstanding as of the Petition Date, and a small tax claim (collectively, the "**Priority Claims**").  The Management Offer includes a cash component to pay the tax and pension contribution claims in full, and further assumes the prepetition employee obligations.  All Priority Claims are thus either paid in full or assumed in their entirety.  As part of this Motion the Debtor also seeks authority to pay the non-assumed Priority Claims as soon as practicable after the Closing.

### I.     The Marketing Process and Attempt to Maximize Going Concern Values

28.     In order to expedite and maximize its asset sales efforts for the benefit of all of the creditors and other interested parties in this Chapter 11 Case, on or about November 18, 2009, the Debtor obtained court authorization to retain the investment banking firm of Mesirow Financial, Inc. ("**Mesirow**") to continue the marketing efforts it had commenced prior to the Petition Date for the solicitation of offers to purchase the Transferred Assets.

29.     Mesirow's postpetition marketing approach included soliciting interest from all qualified purchasers who satisfy the size criteria and risk profile to consummate the purchase of a company such as the Debtor, including strategic and financial buyers.  The Debtor believes the continued marketing efforts of Mesirow assisted in generating interest in a potential sale.

30.     Mesirow started its postpetition remarketing efforts for the Debtor immediately after retention.  It contacted 238 strategic and financial parties regarding their potential interest in a transaction under Section 363 of the Code.  In addition to the Potential Stalking Horse, two firms emerged as having serious interest in the Business. Both firms visited the Debtor's facility in East Moline, met with the management team and were granted access to the online data room.

11

31.     Additionally, one "hybrid" buyer (a strategic party with private equity backing) and two financial buyers executed confidentiality agreements. These parties were sent a comprehensive executive summary of the Business and provided access to the data room; however, they ultimately declined to proceed further stating an issue with the existence of Standard's union affiliations.

32.     The Debtor understands that the main concern that surfaced from Mesirow's discussions with prospective buyers was the uncertainty that surrounded the union negotiations and how the results of those negotiations would affect Standard. Mesirow indicated that it became clear a buyer would not consummate an acquisition unless the unfunded pension liability was left with the estate and no successor liability would exist. The strategic parties that declined prior to executing a confidentiality agreement cited Standard's union affiliation and their own financial instability as reasons for declining. Similarly, many financial sponsors cited a lack of interest in the trucking industry and internal parameters which prevented them from investing in unionized entities.

33.     The Debtor thus did not receive any written offers on the Transferred Assets. In light of the significant, yet ultimately unsuccessful prepetition and postpetition marketing efforts, the Debtor submits that the Management Offer represents the best and most feasible means of selling the Transferred Assets and the Business as a going concern, thereby maximizing the benefits to all creditors and interested parties.

III.    **ASSET PURCHASE AGREEMENT – MANAGEMENT OFFER**

34.     Prior to the filing of this Motion, but subject to the entry of an order of this Court as requested herein, the Debtor executed that certain Asset Purchase Agreement by between

Debtor and Standard Acquisition dated February 12, 2010, a complete copy of which is attached hereto as Exhibit A and expressly made a part hereof ("**Management Offer**").

35.    The Debtor has evaluated the terms and benefits of the Management Offer, as well as the benefits of other alternatives, which at this point in the Chapter 11 Case are limited to liquidation scenarios. In its business judgment, the Debtor has concluded that the Management Offer is the highest and best offer to purchase the Transferred Assets received to date, and provides the best opportunity for a sale of the Business and the assets as a going concern that is critical to maximizing creditor recoveries (both in terms of purchase price and eliminating operational losses).

36.    Due to the previous significant marketing efforts conducted by the Debtor and Mesirow both prior to and after the Petition Date, the Debtor proposes that the Court approve the Management Offer without a bidding process. Simply put, the Debtor submits that higher and better offers will not be forthcoming.

37.    The Management Offer may be summarized as follows:

a.    Purchase of Transferred Assets. The Management Offer proposes to purchase all of the Debtor's right, title and interest in and to all of the Transferred Assets which as more fully defined and/or described in the Management Offer consist of, among other things, the Transferred Assets listed above in paragraph 24.

b.    Excluded Assets. As set forth in the Management Offer, the Transferred Assets expressly exclude specific assets of the Debtor, including the following (collectively, and as provided in full in Section 2.2 of the Management Offer, the "**Excluded Assets**"): (i) all of Standard's deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets; (ii) certain "Excluded Contracts"; (iii) confidential personnel and medical records pertaining to any employee to the extent required to be retained by Standard under

13

applicable law; (iv) other books and records that Standard is required by law to retain that Standard determines are necessary or advisable to retain; (v) all of Standard's rights under the Management Offer, including its rights with respect to the Asset Cash Price; and (vi) any pension plan assets of Standard.

      c.      <u>Purchase Price</u>. The consideration for the Transferred Assets (**"Purchase Price"**) shall be a cash payment of $1,525,265 (the "**Asset Cash Price**"), plus the assumption of significant outstanding liabilities of the Debtor (the "**Assumed Accrued Liabilities**"), both of which are subject to adjustment prior to Closing (as hereinafter defined). The Assumed Accrued Liabilities include: (i) all non-pension, employee Priority Claims actually known and existing as of the Closing; (ii) all outstanding indebtedness to First Midwest, including the Prepetition Indebtedness; (iii) liabilities under Debtor's workers' compensation and driver's liability insurance (which are large-deductible policies) arising prior to the Closing; (iv) amounts due and owing to Mesirow for professional services pursuant to the terms negotiated by Debtor, not to exceed $200,000; (v) all postpetition trade accounts payable incurred in the ordinary course of the Business that remain unpaid by Debtor at the time of the Closing; (vi) all other costs of administration incurred in by Debtor in connection with, and through the dismissal of, the Chapter 11 Case but not yet paid at the time of the Closing, including tax obligations of Debtor.

      d.      <u>Adjustment of Asset Cash Price</u>. The current bar date established by the Court is March 16, 2010. Due to the ongoing high cost of operations and potential operating loses incurred by the Debtor and the Business, the Purchaser has requested a Closing no later than March 5, 20010. Accordingly, the Asset Cash Price is subject to adjustment up to three days prior to Closing to allow the Debtor to reexamine the most current information with respect to the claims that comprise the "Priority Claim Contributions" (prepetition pension fund contributions and prepetition taxes) and the "Pre-Petition A/P" (unpaid prepetition trade accounts

14

payable. The Debtor seeks to ensure the most accurate calculation and highest percentage payment of the applicable prepetition claims. Moreover, in light of the foregoing potential adjustment, the Purchaser has committed to providing up to an additional $100,000 in an effort to ensure that all allowed, unsubordinated known claims receive at least an 85% distribution.

e.  <u>Administrative Expenses of Debtor</u>. The Management Offer contemplates that the Debtor will continue to pay postpetition account payable and other costs of administration of the estate through and until the dismissal of the Chapter 11 Case, which the Committee and the Debtor will seek to accomplish immediately upon the distribution to allowed, unsubordinated, prepetition claims. The "Costs of Administration" unpaid as of the dismissal of the case are assumed in full by Purchaser.

f.  <u>Deposit</u>. Standard Acquisition will remit within two business days after the filing of this Motion an earnest money deposits in the amount of $100,000, which will be held pursuant to the terms of an escrow agreement with counsel for the Debtor (Adelman & Gettleman, Ltd.) in a separate client trust fund account ("**Deposit**"). In the event that Standard Acquisition defaults under the Management Offer, as more fully described therein, Standard Acquisition shall forfeit the Deposit and the Debtor shall be entitled to retain the Deposit as liquidated damages in full and complete satisfaction of any and all damages suffered by the Debtor as a result thereof.

g.  <u>Liabilities Assumed and Not Assumed</u>. In addition to the Accrued Assumed Liabilities, Standard Acquisition shall assume the Debtor's obligations under the "Purchase Contracts" and "Purchased Assets" (not including cure amounts) arising after the Closing and the Debtor's liabilities with respect to the Business and the Transferred Assets arising after closing. Moreover, various "Excluded Liabilities" that are not being assumed by Standard Acquisition are specifically set forth in Section 2.4 of the Management Offer, and include any obligations under

15

the current Collective Bargaining Agreements and any related withdrawal liability to the Pension Funds.

h. <u>Representations and Warranties</u>. The Management Offer contains such representations and warranties of the Debtor and Standard Acquisition as are customary for transactions of this type and size. All representations and warranties shall terminate as of the Closing. Except as expressly set forth in the Management Offer, the Transferred Assets are being sold "AS IS, WHERE IS".

i. <u>Conditions of Closing / Termination Events</u>. In light of the urgency of the financial issues facing the Debtor, the Management Offer required the Debtor to, as soon as practicable following the execution of the Management Offer: (i) to file this Motion, (ii) obtain the entry of the Sale Order (as hereinafter defined); (iii) consummate the transactions contemplated in the Management Offer no later than March 5, 2010 (the "Closing"), unless otherwise agreed in writing by the parties. The Debtor therefore requests that the Sale Order include a provision waiving the 14-day stay pursuant to Bankruptcy Rule 6006(h). In addition thereto, the Management Offer contains such other closing conditions and termination events which are customary for transactions of this type and size.

j. <u>Insider and Employee Matters</u>. The Management Offer has been submitted by an entity owned and controlled by four current members of Standard's management. Further, John Ward is a director of Standard.

k. <u>Executory Contracts</u>. The Management Offer sets forth the "Purchased Contracts" which Standard Acquisition requires to be assumed and assigned at closing pursuant to Section 365 of the Code (the **"Executory Contracts"**). The Debtor is responsible for all cure costs related thereto.

## IV.  SALE HEARING, CREDITOR SUPPORT AND ANTICPIATED DISTRIBUTIONS

### A.  Sale Hearing and Sale Order Authorizing Sale Free and Clear of Interests

38.    The Debtor respectfully requests that this Court set a sale hearing (**"Sale Hearing"**) on or before March 4, 2010.  At the Sale Hearing, the Debtor shall present the Motion and request that the Court enter an order (**"Sale Order"**), *inter alia*: (a) authorizing the Debtor to sell the Transferred Assets free and clear of any and all liens, claims, encumbrances and interests pursuant to the terms of the Management Offer; and (b) authorizing the Debtor to assume and assign the Executory Contracts identified in the Management Offer.

39.    As discussed above, exigent circumstances exist warranting the sale of the Transferred Assets as a going concern as soon as possible under the applicable Code provisions and Bankruptcy Rules.  A sale of the Transferred Assets pursuant to Section 363 of the Code appears to the Debtor be the best mechanism to maximize the value of the Debtor's estate and the distribution to creditors in this Chapter 11 Case.  Time is of the essence as to preserve the Business and ongoing operations as Standard is operating at a loss that it cannot sustain indefinitely.  The Debtor submits that the highest and best purchase price for the Transferred Assets is obtainable solely through continuation of the Debtor's highly valuable customer relationships and pending and upcoming orders; it is therefore essential to promptly offer the Transferred Assets for sale as a going concern.

40.    The Transferred Assets shall be sold on an "AS IS, WHERE IS" basis and without representations or warranties of any kind, nature, or description by the Debtor, its agents or estate except to the extent expressly set forth in the Management Offer.  Except as otherwise provided in such agreement, all of the Debtor's right, title and interest in and to the Transferred Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims,

charges, options and interest thereon and there against (collectively, the **"Interests"**) in accordance with Section 363 of the Code, with all such valid Interests to attach to the net proceeds of the sale of the Transferred Assets.

**B.**     **Assumption, Payment or Subordination of All Known Claims – The Sale is in the Best Interests of Creditors**

41.     The Debtor submits that the Management Offer presents a uniquely successful outcome for this Chapter 11 Case.  In summary, it is anticipated that all of the known claims against the Debtor will either be (i) assumed by Purchaser and paid in full in the ordinary course of its future business operations (*e.g.* insurance claims, priority vacation claims of employees and administrative costs of the Chapter 11 Case unpaid as of Closing); (ii) paid by the Debtor with the funds received from the Asset Cash Price (*i.e.* the Priority Claims not assumed by Purchaser and the pre-petition trade debt), which will likely generate a distribution of at least 85%; or (iii) in the event an agreement can be reached with both Pension Funds, voluntarily subordinated to the general unsecured claims and therefore not paid (*i.e.* approximately $68 million of withdrawal liability to the Pension Funds).

42.     The Management Offer is predicated on the revised collective bargaining agreements that management was able to negotiate with the unions.  This bargaining process began well before the filing of the Chapter 11 Case, and represents a lengthy, arduous and frankly trying process for all parties involved.  The successful outcome of these negotiations was never a certainty; indeed, the Proposed Stalking Horse and other potential buyers specifically pointed to this issue as the major roadblock to concrete commitment to a sale process in the Chapter 11 Case.

43.     In the same vein, the proposed subordination of the withdrawal liability is a long-standing issue for the Debtor and the Pension Funds that predated the Chapter 11 Case, and is

18

equally critical to a meaningful distribution to the prepetition trade creditors. Prior to the Sale Hearing, the Debtor anticipates filing with the Court –and is currently in the process of drafting– stipulations by and between the Debtor on the one hand, and the Pension Funds and the unions on the other, that formally memorialize the understandings reached to date.

44.     The Debtor has reached an agreement in principal with the Central States Fund for the subordination of the relevant withdrawal liability (approximately $63 million) behind the other general, unsecured, non-priority claims of the Debtor. As of the filing of this Motion, the Debtor does not have a similar agreement with the Local 710 Fund with respect to its withdrawal liability claim (approximately $5 million). Given the status of its negotiations with the Local 710 Fund to date and the need to close the proposed sale transaction as soon as reasonably possible under the applicable sections of the Code and the Bankruptcy Rules, the Debtor filed this Motion prior to reaching a final agreement with the Local 710 Fund. The Debtor continues to employ its best efforts to obtain the proposed subordination prior to the proposed Sale Hearing.

45.     Overall, in addition to the significant payment to general unsecured trade creditors, this sale to the Standard Acquisition: (i) enables the current employees of the Debtor to retain their jobs going forward; (ii) preserves union jobs under a new collective bargaining agreement; and (iii) results in new contributions to the Central States Pension Fund going forward, as well as contributions to the Health and Welfare Funds for members of all unions. Accordingly, the Debtor submits that the Sale is in the best interest of all its creditors, and that it represents a resolution of the bankruptcy case that benefits all constituencies of the Debtor.

46.     For these reasons, the Debtor understands that it has the support of unions, the Central States Fund, First Midwest and the Committee to move forward with the proposed sale.

19

# V. ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

47.     As part of the Motion, the Debtor seeks authority to assume and assign the Executory Contracts. The Executory Contracts consist of, among others, the leases for the Debtor's terminals, its equipment leases, carrier contracts, broker contracts, pricing agreements and other contracts further detailed on Schedule 2.5 of the Management Offer, which schedule may be updated and revised as of the Closing.

48.     The Debtor proposes the following procedures for assuming and assigning the Executory Contracts:

a.      Within seven days of the Sale Hearing, the Debtor shall file a notice ("**Assumption Notice**") with the Court and serve such Assumption Notice on each non-debtor party to those Executory Contracts proposed to be assumed and assigned that: (i) identifies the Purchaser; and (ii) states the cure amounts that the Debtor believes are necessary to assume and assign such Executory Contracts pursuant to Section 365 of the Code, if any ("**Cure Amount**"). Any party receiving an Assumption Notice may file a written objection to the Cure Amount and/or proposed assumption and assignment at or prior to the Sale Hearing, and shall be entitled to appear at the Sale Hearing and object to the proposed assumption and assignment of its Executory Contract;

b.      The Debtor requests that a hearing to determine any objections to the Cure Amount or proposed assumption be set to run concurrently with the Sale Hearing; and

c.      At the Sale Hearing, the Debtor shall request entry of an order approving the assumption and assignment of any Executory Contract to the Purchaser upon terms which the Purchaser agrees to accept and assume.

20

## VI.   APPLICABLE AUTHORITIES

### A.   Section 363 Sale

49.   Section 363 of the Code provides that the Debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the Estate." 11 U.S.C. § 363(b).   To approve the use, sale or lease of property outside the ordinary course of business, there must be "some articulated business justification."   *See Fulton State Bank v. Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); and *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *see also Stephens Inc., v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986); *In re Abbott Dairies of Pa., Inc.*, 788 F.2d 143, 145-47 (3d Cir. 1986); *In re Telesphere Communications, Inc.,* 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999); and *In re Delaware & Hudson Rv. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).

50.   Once a valid business justification made in the ordinary course of business is established, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Company*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *see also In re Johns-Manville Corp.*, 60 B.R. 612, 615-616 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions").   Similarly, a court will defer the debtor's judgment to make a sale outside the ordinary course of business pursuant to Section 363, when the debtor has "sound business reasons for making the sale." *Schipper*, 933 F.2d at 515.

51.   Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision-making. *See Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981).   Therefore, the relief requested in this Motion should be granted

if the Debtor demonstrates a sound business justification therefor. *See Schipper*, 933 F.2d at 515; *In re Lionel Corp.*, 722 F.2d at 1071; *In re Delaware Hudson Rv. Co.*, 124 B.R. 169 at 179.

52.     As explained above, the Debtor has sound business justifications for selling substantially all of its assets at this time. The Debtor does not have the financial resources or access to capital necessary to maintain is operating costs indefinitely. The uncertainties concerning the Debtor's financial condition have caused the Debtor to be in jeopardy of losing its valuable customer base. The Debtor therefore has determined, based upon its business judgment that the most viable option for maximizing the value of its estate is through a sale of the Transferred Assets.

53.     Based upon these factors and the facts surrounding the sale discussed above, the Debtor has demonstrated a sound business justification for the proposed sale of the Transferred Assets pursuant to the Management Offer.

### B.     The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear of Liens, Claims, Encumbrances and Interests

54.     Under Section 363(f) of the Code, a debtor in possession may sell property free and clear of any lien, claim, or interest in such property if, among other things:

(a)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. §363(f).

55.     Because Section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will be sufficient to permit the sale of the Transferred Assets free and clear of

22

any and all Interests. The Debtor believes that the primary entities holding liens on the Transferred Assets are the Secured Creditors. The Debtor believes that has (in the case of First Midwest) and will be able to procure the consent of all Secured Creditors to the proposed sale of their respective collateral thereby satisfying Section 363(f) of the Code.

56.     Moreover, all holders of Interests, including First Midwest, can be compelled to accept a money satisfaction of such Interests in legal or equitable proceedings in accordance with Section 363(f)(5) of the Code. Such legal or equitable proceedings include proceedings to confirm a plan of reorganization, under which the holder of a lien may be compelled to accept payment in satisfaction of its lien pursuant to Section 1129(b)(2)(A) of the Code.

57.     Indeed, Section 1129(b)(2)(A) of the Code specifically allows a debtor to sell property subject to a lien, free and clear of such lien, if such lien attaches to the net proceeds of the sale, subject to any claims and defenses the debtor may possess with respect thereto. The Debtor proposes that any Interests in the Transferred Assets attach to the net proceeds from the sale of the Transferred Assets in this Chapter 11 Case.

58.     Based upon the foregoing, the sale should be approved under Section 363(f) of the Code.

**C.      The Sale Satisfies the Requirements of Bankruptcy Code Section 363(m) for a Sale Made in Good Faith**

59.     Section 363(m) reflects that the Code strongly favors finality of sale orders, and the protection of good-faith purchasers maximizes the value of the assets for sale, which benefits both debtors and creditors. *See Hower v. Molding Systems Engineering Corp.,* 445 F.3d 935, 938 (7th Cir. 2006).

60.     While "good faith" is undefined in the Code, the Seventh Circuit has held that "The requirement that a purchaser act in good faith, of course, speaks to the integrity of his

23

conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Matter of Frain Services, Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986)(*citing In re Rock Industries Machinery Corp.*, 572 F.2d 1995, 1198 (7th Cir. 1978)).

61.     In *In re Condere Corp.*, 228 B.R. 615, 631 (Bankr. S.D. Miss. 1998) (which adopted the applicable *Rock Industries* standard) the court found that common management between a Chapter 11 debtor and prospective purchaser of its assets, while necessitating higher scrutiny of proposed sale, was not sufficient to destroy the prospective purchaser's "good faith." *Condere* approved the sale of debtor's assets pursuant to Section 363 of the Code citing the involvement of the unsecured creditors committee in connection with sale, and a lack of evidence of any fraud or collusion by purchaser.

62.     While the members of Standard Acquisition are insiders of the Debtor pursuant to 11 U.S.C. § 101(31)(B), the Management Offer represents extensive, arms length and good faith negotiations and discussions between representatives of the Debtor and Standard Acquisition and their respective counsel and advisers.   Moreover, the Debtor has strived to keep the Committee and its counsel full apprised of all significant developments in this case, including the proposed buyout by management, and has repeatedly discussed the proposed terms of the Management Offer with the Committee.  The Debtor understands that the Committee generally does not object to this sale and supports this Motion subject to its further review of the Management Offer.

**D.     The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized**.

63.     Section 365(f)(2) of the Code provides that:

> [t]he trustee may assign an executory contract or unexpired lease of the debtor only if–

24

(A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

64.    Under Section 365(a) of the Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor.  This subsection provides as follows:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee–

(A)    cures, or provides adequate assurance that the trustee will promptly cure, such default . . . .;

(B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

65.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Env. Engineering Corp.  (In re Sandshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992); *see also, Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988)(further explaining that "[a]lthough no single solution will satisfy every case, the required assurance will fall

25

considerably short of an absolute guarantee of performance"); and *In re Prime Motor Inns Inc.,* 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).

66.     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See e.g., In re Bygaph, Inc.* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986)(adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

67.     To the extent that any defaults exist under any of the Executory Contracts that are to be assumed and assigned in connection with the sale of the Transferred Assets, the Debtor will either cure any such default at Closing as a condition of such assumption and assignment, or obtain the consent to the assumption and assignment on such modified terms as may be agreed to by the non-debtor party to such Executory Contracts. Moreover, the Debtor will adduce facts at the Sale Hearing demonstrating the financial wherewithal of Standard Acquisition, its experience in the industry, and its willingness and ability to perform under the proposed Executory Contracts to be assumed and assigned to it.

68.     The Sale Hearing therefore will provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of Standard Acquisition to provide adequate assurance of future performance under the contracts to be assumed. The Court therefore should have a sufficient basis to authorize the Debtor to reject or assume and assign the Executory Contracts as set forth in the Management Offer.

**E.       Notice Requirements**

69.     The Debtor has provided a copy of this Motion and all exhibits via ECF filing, U.S. Mail and/or e-mail on Friday, February 12, 2010 to the following persons: (a) the twenty

largest unsecured creditors in this Chapter 11 Case, including the members of the Committee (and Committee counsel); (b) the Secured Creditors and/or their counsel; (c) the United States Trustee's Office in this District; (d) all other entities that have filed requests for notices pursuant to Rule 2002 of the Bankruptcy Rules. The Debtor will provide notice of the Sale Hearing to the above parties immediately upon receiving a hearing date from the Court. The Debtor respectfully requests that such hearing be conducted no later than March 4, 2010 at a time convenient for the Court.

70. In addition, the Debtor will provide Assumption Notice as provided herein to all parties to the Executory Contracts.

71. Rules 2002(a)(2) and 6004(a) of the Rules require that notice of a proposed sale of substantially all of a debtor's assets be sent to all creditors. The Debtor asserts that it would be impracticable to forward this Motion in its entirety (which includes the lengthy Management Offer and all Schedules attached thereto) to all of its unsecured creditors listed in the Creditor Matrix maintained by the Clerk of the Bankruptcy Court in the Chapter 11 Case. Pursuant to Bankruptcy Rule 2002(m), the Debtor hereby respectfully requests that the Court utilize the Bankruptcy Noticing Center for purposes of providing notice of the Sale Hearing to all creditors in the case and that the foregoing notice be deemed adequate and reasonable under the Code and Bankruptcy Rules.

*[The remainder of this page is intentionally left blank]*

85931v.3 2/12/2010

WHEREFORE, Standard Forwarding Co., Inc., Debtor herein respectfully requests: (i) that this Court schedule a Sale Hearing to consider the entry of the Sale Order, and (ii) entry of the Sale Order in the form to be provided to the Court forthwith, and (iii) that it be awarded such other and further relief as is requested herein or is otherwise just and equitable.

Respectfully submitted,

Standard Forwarding Co., Inc.,


By:   /s/ Nathan Q. Rugg
       One of Its Attorneys


HOWARD L. ADELMAN, ESQ. (ARDC# 0015458)
HENRY B. MERENS, ESQ. (ARDC# 6181695)
NATHAN Q. RUGG, ESQ. (ARDC# 6272969)
ERICH S. BUCK, ESQ. (ARDC# 6274635)
ADELMAN & GETTLEMAN, LTD.
53 West Jackson Blvd., Suite 1050
Chicago, Illinois 60604
(312) 435-1050
Attorneys for Debtor

85931v.3  2/12/2010

# STANDARD FORWARDING CO. INC.
## SECTIONS 363 & 365 SALE MOTION SERVICE LIST (2/12/2010)

**VIA EMAIL/ECF**

*United States Trustee*
Sabrina M. Petesch
United States Department of Justice
Office of the United States Trustee
401 Main Street, Suite 1100
Peoria, IL 61602
Fax: 309-671-7857
Sabrina.M.Petesch@usdoj.gov

*Local Counsel for Debtor*
Sumner Bourne
411 Hamilton Blvd #1600
Peoria, IL 61602
sbnotice@mtco.com

*Counsel to First Midwest Bank*
Michael J. Small, Esq.
Thomas Hardy, Esq.
Foley & Lardner LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60654
Fax: 312-832-4700
msmall@foley.com

*Local Counsel to Wells Fargo*
Robert Lindstrom, Esq.
311 E. Main Street, Suite 412
Bondi Building
Galesburg, IL  61401
Fax: 309-343-3001
bob@boblindstromlaw.com

*Wells Fargo Bank*
Wells Fargo Bank
MAC N8236-043
203 W. 3rd Street, 4th Floor
Davenport, IA 52801
Attn: Jim Hilgenberg
jim.hilgenberg@wellsfargo.com

*Counsel for Internal Revenue Service*
Gerard Brost
United States Department of Justice
211 Fulton, Suite 400
Peoria, IL 61602
Fax: 309-671-7259
Gerard.brost@usdoj.gov

*Counsel for Illinois Department of Revenue*
William Katich
U.S. Attorney Office
Revenue Litigation Bureau
500 S. Second Street
Springfield, IL 62706
Fax: 217-782-1396
w.katich@aty.state.il.us

*Counsel for Central States Funds*
Brad R. Berliner
Central States Funds Law. Dept.
9377 W. Higgins Rd.
Rosemont, IL 60018
bberliner@centralstates.org

Chris Dickerson
Felicia Gerber Perlman
Skadden Arps
155 North Wacker Drive
Chicago, IL 60606
cdickers@skadden.com
felicia.perlman@skadden.com

*Counsel to Committee*
Steven B. Towbin, Esq.
Gordon E. Gouveia, Esq.
Shaw Gussis Fishman Glantz
Wolfson & Towbin, LLC
321 N. Clark Street, Suite 800
Chicago, IL 60610
stowbin@shawgussis.com
ggouveia@shawgussis.com

*Counsel for TM Doyle Teaming Company*
James L. Hafele
301 SW Adams St. #700
Peoria, IL 61602
Fax: 309-676-0324

*Counsel for EMC Insurance Companies*
Jeffrey D. Goetz
Bradshaw, Fowler, Proctor & Fairgrave
801 Grand Avenue, Ste 3700
Des Moines, IA 50309-8004
goetz.jeffrey@bradshawlaw.com

*COMMITTEE OF CREDITORS HOLDING*
*UNSECURED CLAIMS*

*Deputy Gen. Counsel for: Central States,*
*Southeast and Southwest Areas Pension*
*Fund and Central States, Southeast and*
*Southwest Areas Health and Welfare Fund*
Robert A. Coco, Esq. - Chairman
Central States Law Department
9377 West Higgins Road
Rosemont, IL 60018
Fax: 847-518-9797
rcoco@centralstates.org

David D. Engstrom
Office of the President
Mutual Wheel Company
2345 4th Avenue
Moline, IL 612165
(309) 757-1200
daveengstrom@hotmail.com

Rick Stoltenberg
Midwest Wheel Companies
8502 Northwest Blvd
Davenport, IA 52806
(563) 445-3416 (563) 322-5940 fax
rickstoltenberg@midwestwheel.com

*Counsel for: Teamsters National Freight*
*Industry Negotiating Committee*
Frederick Perillo
Sara Geneen
Previant, Goldberg, Uelmen, *et al.*
1555 N. River Center, Suite 202
Milwaukee, WI 53212
(414) 271-4500
fp@previant.com
sjg@previant.com

*Counsel for: IBT Local 710 Pension Fund*
Paul M. Newcomer
Law Office of Russell N. Luplow
185 Oakland Avenue, Suite 200
Birmingham, MI 48009
(248) 644-8666
pmnewcomer@msn.com

**VIA REGULAR U.S. MAIL**

*20 Largest Creditors* -
(not including committee members)

Ameriquest-Headquarters
PO Box 828997
Philadelphia, PA 19182
Fax: 856-773-0617

Bridgestone-Firestone, Inc.
PO Box 73418
Chicago, IL 60673
Fax: 615-493-1814

Bridgestone Bandag, LLC
PO Box 92090
Chicago, IL 60675
Fax: 563-262-1153

Osco Incorporated
PO Box 70
Lemont, IL 60439
Fax: 630-257-2181

Smith Oil Corporation
PO Box 3275
Rockford, IL 61106
Fax: 815-229-8106

Sopus Products
PO Box 7247-6236
Philadelphia, PA 19170
Fax: 713-217-3308

Thermo King Quad Cities
PO Box 6157
Rock Island, IL 61204
Fax: 309-787-8393

Twin Bridges Truck City Inc.
PO Box 1720
Bettendorf, IA 52722
Fax: 563-355-8529

Wisconsin Health Fund
Box 88487
Milwaukee, WI 53288
Fax: 414-257-9705

Brown Truck Leasing Corp.
2525 East Euclid, Suite 214
Des Moines, IA 50317
Fax: 515-265-9993

Diesel Dogs Truck Repair, Inc.
2091 Energy Park Drive
St. Paul, MN 55108
Fax: 651-636-2514

EDS Mobile Maintenance Svc.
8341 W. 133rd Street
Orland Park, IL 60462
Fax: 708-423-6772

Fauser Oil Co. Inc.
Attn: Darrell Wilhelm
1640 Normandy Court, Suite A
Lincoln, NE 68512
Fax: 402-466-6838

Interstate Transport Repair Inc.
8500 W. 53rd Street
McCook, IL 60525
Fax: 708-447-4640

Mellon Financial Services
Central States
5503 N. Cumberland Road
Chicago, IL 60656
Fax: 847-518-9773

US Trailer Parts & Supply, Inc.
4334 S. Tripp Avenue
Chicago, IL 60632
Fax: 773-927-7028

Zacher Truck Service
929 W. Waterford Avenue
Milwaukee, WI 53221
Fax: 414-482-4015

Decatur Mack
aka/Mack Sales & Service of Decatur, Inc.
P.O. Box 3665
Quincy, IL 62305

Pifer Properties Inc.
Pifer Properties LLC
Pifer Property Holdings LP
253 Sierra Country Circle #672
Gardnerville, NV 89560